## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ENVIRONMENTAL LAW & POLICY )
CENTER and NATIONAL WILDLIFE )
FEDERATION )
  )
                Plaintiffs, )
          v. )
  )     Case No. _____
UNITED STATES COAST GUARD, )
REAR ADMIRAL JOANNA M. NUNAN, )
in her official capacity as the Ninth )
Coast Guard District Commander )
  )
              Defendants. )
  )

---

## COMPLAINT FOR DECLARATORY RELIEF

---

Plaintiffs Environmental Law & Policy Center ("ELPC") and National Wildlife Federation ("NWF") bring this action on behalf of themselves and their members, and they allege the following:

### INTRODUCTION

1. Congress enacted the Oil Pollution Act of 1990 ("OPA 90") in response to the catastrophic Exxon-Valdez oil spill in 1989, and the weak emergency response to that tragic and damaging oil spill.

2. OPA 90 requires the United States Coast Guard ("Coast Guard") to prepare and approve Area Contingency Plans ("ACP") to address environmental

emergencies, especially oil spills, in the nation's coastal zones, including the Great Lakes other inland coastal zones.  OPA 90 requires, among other things, that ACPs be "adequate to remove a worst case discharge." 33 U.S.C § 1321(j)(4)(C)(i).

3.     The Coast Guard approved an ACP for northern Michigan ("the NMACP") which includes the Straits of Mackinac, which connects Lake Michigan and Lake Huron under the Mackinac Bridge, and the surrounding coastal areas.

4.     Coast Guard Commandant Adm. Paul Zukunft testified before the United States Senate Commerce, Science and Transportation Committee and on several other occasions that: "I would go on the record to say that the Coast Guard is not *semper paratus* for a major pipeline oil spill in the Great Lakes."

5.     Enbridge Energy Partners L.P., a subsidiary of Enbridge, Inc., currently runs two crude oil pipelines referred to as "Line 5" under the Straits of Mackinac.

6.     Enbridge is the operator for the Line 6B oil pipeline, which ruptured in 2010 in Marshall, Michigan along the Kalamazoo River and was one of the largest inland oil spills in U.S. history.

7.     The Enbridge Line 5 oil pipelines are 65 years old.

8.     Under OPA 90, Enbridge cannot operate the Line 5 oil pipelines unless it has an approved Facility Response Plan ("FRP") in place and is operating in compliance with that FRP.  33 U.S.C. § 1321(j)(5)(F).

2

9.     The pipeline's FRP must be consistent with the Coast Guard's ACP. 33 U.S.C. § 1321(j)(5)(D)(i).

10.     The current ACP is, by the Coast Guard's admission, not "adequate to remove a worst case discharge" in the open waters of the Great Lakes.

11.     The NMACP fails to comply with OPA 90 requirements and is invalid as applied to pipelines in those open waters.

12.     Without a valid ACP covering this geographic area, any FRP for a pipeline that would discharge directly into the open waters of the Great Lakes likewise fails to meet OPA 90 requirements.

13.     Plaintiffs Environmental Law & Policy Center, National Wildlife Federation and their members seek a declaratory judgment under the Oil Pollution Act of 1990 and the Administrative Procedure Act that the Coast Guard's approvals of portions of the NMACP that apply to oil pipelines in the open waters of the Great Lakes and, accordingly, any FRP covering oil pipelines operating in those open waters, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, specifically OPA 90.  5 U.S.C. § 706(2)(A).

14.     Plaintiffs Environmental Law & Policy Center, National Wildlife Federation and their members also seek a declaratory judgment under the Oil Pollution Act of 1990 and the Administrative Procedure Act that the Coast Guard's approvals of portions of the NMACP that apply to oil pipelines in the open waters

of the Great Lakes and, accordingly, any FRP covering oil pipelines operating in those open waters, are unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.  5 U.S.C. § 706(2)(F).

### JURISDICTION AND VENUE

15.    This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, and the Oil Pollution Act of 1990, 33 U.S.C. § 1321(j), and also seeks relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a), 2202.

16.    The Coast Guard's approval of the NMACP harmed and continues to harm Plaintiffs and their members because the Coast Guard, by its own sworn testimony, is not adequately prepared to respond to a worst case discharge, which is identified in the NMACP as a major discharge from Enbridge's Line 5 into the open waters of the Great Lakes.

17.    This Court has jurisdiction over this action pursuant to Section 1017(b) of OPA 90, codified at 33 U.S.C. § 2717(b); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); and 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his or her duty).

18.    Venue is proper in this Court under 33 U.S.C. § 2717(b), which provides that venue for violations of OPA 90 shall lie in any district in which the injury or damages occurred. Venue is also proper under 28 U.S.C. § 1391(b)(2), which provides that a civil action may be brought in a judicial district in which a

substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated.

19.    Plaintiffs challenge Defendants' approval of the NMACP for Coast Guard Sector Sault Ste. Marie, which is responsible for all Coast Guard missions on Lake Superior and northern Lakes Michigan and Huron. Coast Guard Sector Sault Ste. Marie has offices at 145 Water St., Alpena, Michigan in this district.  A portion of the Straits of Mackinac coastal zone through which Enbridge operates the relevant section of Line 5 is located in this district. A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

20.    Plaintiff Environmental Law & Policy Center ("ELPC") is a leading Midwest-based not-for-profit public interest organization working to improve environmental quality and public health, protect the Great Lakes and other natural resources, and enhance the quality of life for people through healthier clean air, safe, clean drinking water and enjoyable recreational opportunities.  ELPC has members throughout Michigan and the Midwest.  ELPC's headquarters and principal office is in Chicago and the organization is incorporated in Illinois. ELPC has an office and staff in Michigan at 1514 Wealthy St. SE, Suite 256, Grand Rapids, Michigan 49506.

21.    Plaintiff National Wildlife Federation ("NWF") is the nation's largest not-for-profit conservation advocacy and education organization. With over 750,000 members nationwide and more than 26,000 members in Michigan, its mission includes inspiring Americans to protect wildlife and natural resources for our children's future, as well as protecting wildlife and natural resources from the impacts of spills of oil or hazardous substances. NWF is a District of Columbia nonprofit corporation with its principal office located in Virginia and a Great Lakes office headquartered at 213 West Liberty Street, Second Floor, Ann Arbor, Michigan, 48104.

22.    Defendant United States Coast Guard ("Coast Guard") is the lead federal agency for planning and response to environmental emergencies in coastal zone and major inland water bodies, such as oil spills. 33 U.S.C. § 1321(j). The Coast Guard ensures that requirements of applicable laws are followed and enforced with respect to the preparation and revision of regional and area contingency plans, such as the NMACP. These requirements include, among other things: developing federal contingency plans; and approving, disapproving, or approving with modifications the preauthorization plans that address specific oil spill clean-up measures. 40 C.F.R. § 300.120. Executive Order 12777 delegates the President's authority to approve ACPs and FRPs to the Coast Guard. *See* Executive Order 12777, 56 Fed. Reg. 54757 (Oct. 22, 1991).

23.     Defendant Rear Admiral Joanna M. Nunan[1] is the Ninth Coast Guard District Commander.  In that capacity, she is responsible for approving all ACPs for the Ninth District, including the NMACP for Sector Sault Ste. Marie.

## STANDING

24.     Plaintiffs' and their members' interests are directly harmed by the risk of an oil spill or other discharge in the Great Lakes that cannot be adequately cleaned up, removed or remediated.

25.     Plaintiffs have members with concrete interests in the preservation and protection of the Great Lakes, including the geographic area covered by the NMACP and specifically the Straits of Mackinac.  Plaintiffs' members use and enjoy the Great Lakes for aesthetic and recreational reasons, and for scientific research.  They enjoy observing the fish and wildlife, visiting the coasts, boating, kayaking, and swimming.  Members also rely on the Great Lakes for safe, clean drinking water and healthy fisheries.  These members intend to continue to use the Great Lakes for scientific research, recreational pursuits, or aesthetic enjoyment on a regular, ongoing basis now and in the future, including this year.

26.     A worst case discharge that cannot be adequately removed, such as a leak from Enbridge's Line 5 oil pipeline at the Straits of Mackinac, would contaminate the water and shorelines of the affected zone, severely impair

---

[1] Defendant Rear Admiral Joanna M. Nunan recently replaced Rear Admiral June E. Ryan as the Ninth Coast Guard District Commander.

ecosystems for fish and wildlife, diminish the ecological value of the region, and harm the public health and welfare.

27.    This interferes with members' aesthetic, recreational, and use and enjoyment of this area, threatens fish and wildlife inhabiting areas in and around the Straits, and diminishes the value of properties located near contaminated shorelines.  This also threatens members' supply of safe, clean drinking water from the Great Lakes and endangers public health.

28.    According to a May 2018 analysis of economic damages from an oil spill in the Straits prepared by Michigan State University, the estimated regional economic damages from a major spill of 2,500,000 gallons of crude oil at the Straits of Mackinac would total at least $697.5 million in natural resources damages and restoration, and over $5.6 billion in total economic impact.  This economic impact includes damages to tourism, commercial fishing, municipal water systems related to drinking water and wastewater treatment, and coastal property.  The May 2018 Michigan State University Report states that these cost figures do not account for damages to public health, the challenges of containment, or the possibility of an even bigger spill so, therefore, they underestimate the full financial impact of a major oil spill.

29.    Plaintiffs have members that reside or have residences in Michigan near the Straits of Mackinac.  A worst case oil spill that cannot be adequately

cleaned up, removed and remediated, such as a breach in Line 5 at the Straits of Mackinac, would damage the public and private property in the contaminated area. It would also diminish the value of members' properties located near contaminated shorelines depending on the precise location and extent of the oil spill, the timing of the oil spill, and the efficiency of the clean-up activities.

30.     Plaintiffs' and their members' interests fall within the zone of interests protected under OPA 90.

31.     The Coast Guard is not prepared for a worst case discharge in the open waters of the Great Lakes. A breach in a pipeline operating in the Straits of Mackinac would rapidly discharge into at least one of the Great Lakes.

32.     Had the Coast Guard complied with OPA 90 and only approved an ACP adequate to remove a worst case discharge, it could not have approved the NMACP with respect to oil pipelines in the Straits of Mackinac.

33.     The Coast Guard's approval of the NMACP allows for the continued operation of Enbridge's Line 5 oil pipeline, which directly harms Plaintiffs' interests by perpetuating the risk of an oil discharge in the Great Lakes while the Coast Guard is not "semper paratus" – prepared and always ready – to clean up, remove and remediate the spilled oil.

34.     Without an ACP approved by the Coast Guard, companies cannot legally obtain approval of their FRPs.  *See* 33 U.S.C. § 1321(j)(5)(D)(i) (FRPs must be "consistent with" the requirements of the NCP and ACPs).

35.     FRPs must be consistent with the ACP.

36.     An FRP must be re-submitted for approval any time there is a "significant change," which includes modifications to the ACP.  *See* 33 U.S.C. § 1321(j)(5)(D)(vi) (FRP must "be resubmitted for approval for each significant change"); 49 C.F.R. § 194.121(b) ("If a new or different operating condition or information would substantially affect the implementation of a response plan, the operator must immediately modify its response plan to address such a change").

37.     This "change" triggering re-approval of the FRP includes any change to the ACP that has a "significant impact on the equipment appropriate for response activities."  49 C.F.R. § 194.121(b)(7).

38.     An oil pipeline facility cannot continue operating unless and until a new FRP is approved.

39.     OPA 90 only allows a facility to transport oil if: (1) its FRP was approved; and (2) the facility is operating in compliance with the FRP.  33 U.S.C. § 1321(j)(5)(F).

40.    As long as the NMACP is in violation of OPA 90 with respect to oil pipelines in open waters of the Great Lakes, the Line 5 oil pipeline cannot operate in the interim.

41.    Plaintiffs seek relief to redress harms and injuries caused by the Coast Guard's unlawful approval of the NMACP in violation of OPA 90 with respect to the Straits of Mackinac, which connects Lake Huron and Lake Michigan.

42.    If the Court finds the Coast Guard's approval to be unlawful pursuant to 5 U.S.C. § 706, it must set aside the agency's approval of the ACP with respect to response plans for discharges into the open waters of the Great Lakes.

43.    If approval of the NMACP is set aside with respect to the Straits of Mackinac response plans, then any FRP for an oil pipeline in the open waters of the Great Lakes covered by the NMACP must cease operations until a new ACP is approved and the FRP is modified, re-submitted and approved.

## APPLICABLE LAW

### *The Administrative Procedure Act*

44.    The Administrative Procedure Act requires an agency action to be held unlawful and set aside if it exceeds statutory authority or is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A), 706(2)(C).   The Administrative Procedure Act requires an agency action to be held unlawful or set aside if it "unwarranted by the

facts to the extent that the facts are subject to trial de novo by the reviewing court."
5 U.S.C. § 706(2)(F).

*Clean Water Act and Oil Pollution Act of 1990*

45.    The Clean Water Act's ("CWA") goal is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a). Congress declared "that it is the policy of the United States that there should be no discharges of oil . . . into or upon the navigable waters of the United States, [or] adjoining shorelines."  33 U.S.C. § 1321(b)(1).

46.    On August 18, 1990, Congress enacted OPA 90, which amended § 331(j) of the CWA, 33 U.S.C. § 1321(j).  Oil Pollution Act of 1990, Pub. L. No. 101-380, § 4202(a)(6), 104 Stat. 484 (1990).

47.    Congress enacted OPA 90 in response to the Exxon-Valdez oil spill disaster in Alaska's Prince William Sound on March 23, 1989.

48.    OPA 90 was designed to require *proactive* responses to oil spills by ensuring regulated entities only operate vessels and facilities in areas where response teams can adequately address a worst case discharge.

49.    OPA 90 requires the preparation of a National Contingency Plan ("NCP") and ACPs.  *See* 33 U.S.C. § 1321(j)(4).

50.    ACPs are prepared under the direction of and approved by the Coast Guard for coastal zone and major inland water bodies.

51.     ACPs are designed to respond to environmental emergencies within a defined geographic area. 33 U.S.C. § 1321(j)(4)(B). *See also* Executive Order 12777, 56 Fed. Reg. 54757 (Oct. 22, 1991).

52.     These ACPs are developed by Area Committees, which are comprised of members appointed by the President from federal, state, and local agencies, and members of federally recognized Indian tribes. 33 U.S.C. § 1321(j)(4)(A).

53.     An ACP "shall, when implemented in conjunction with the National Contingency Plan, **be adequate to remove a worst case discharge**, and to mitigate or prevent a substantial threat of such a discharge, from a vessel, offshore facility, or onshore facility operating in or near the area."   33 U.S.C. § 1321(j)(4)(C) (emphasis added).

54.     A worst case discharge is defined for facilities, such as oil pipelines, as "the largest foreseeable discharge in adverse weather conditions."   33 U.S.C. § 1321(a)(24).

55.     "Remove" or "removal" is defined as "containment and removal of the oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches."   33 U.S.C. § 1321(a)(8).

56.     OPA 90 also imposes requirements on operators of facilities that, because of their location could "reasonably be expected to cause significant and substantial harm to the environment by discharging into navigable waters." 33 U.S.C. § 1321(j)(5)(E).

57.     Operators of these "substantial harm" facilities must submit FRPs, which must be "**consistent with the requirements** of the National Contingency Plan **and Area Contingency Plans."**   33 U.S.C. § 1321(j)(5)(D)(i) (emphasis added).

58.     An oil pipeline segment requires an FRP if it meets certain criteria under 49 C.F.R. § 194.103, such as the amount of oil it transports and whether it would discharge into navigable waters.  49 C.F.R. § 194.103(c).

59.     Without an ACP approved by the Coast Guard, companies such as Enbridge cannot legally obtain approval for their FRPs.  Since FRPs must be consistent with the ACP, an FRP must be re-submitted for approval any time there is a "significant change" – which includes modifications to the ACP.  *See* 33 U.S.C. § 1321(j)(5)(D)(vi) (FRP must "be resubmitted for approval for each significant change"); 49 C.F.R. § 194.121(b) ("If a new or different operating condition or information would substantially affect the implementation of a response plan, the operator must immediately modify its response plan to address such a change").

60.    The "significant change" triggering re-approval of the FRP includes any change to the ACP that has a "significant impact on the equipment appropriate for response activities." 49 C.F.R. § 194.121(b)(7).

## FACTUAL BACKGROUND

### *Spill Response in the Straits of Mackinac*

61.    The Ninth Coast Guard District serves the coastal operational area for the Great Lakes, which includes the Straits of Mackinac.

62.    The Straits of Mackinac are located in the spill response zone of Coast Guard Sector Sault Ste. Marie. *See* 33 C.F.R. § 3.45-45(a) (describing boundaries of Sector Sault Ste. Marie Marine Inspection Zone).

63.    The Straits of Mackinac is a navigable water of the United States that connects Lake Michigan and Lake Huron.

64.    Lake Michigan and Lake Huron are two of the five Great Lakes, which are designated by federal statute as an area that is "unusually sensitive to environmental damage if there is a hazardous liquid pipeline accident." 49 U.S.C. § 60109(b)(2).

65.    Line 5 is a 645-mile onshore oil pipeline operated by Enbridge Energy Partners, L.P.

66.    A 4.5-mile segment of the Line 5 oil pipeline runs underneath the Straits of Mackinac.

67.     The Line 5 oil pipeline was built in 1953, and it runs from Superior, Wisconsin through the Upper Peninsula of Michigan, across the Straits of Mackinac, through the Lower Peninsula of Michigan, across the St. Clair River, and then to Sarnia, Ontario, Canada.

68.     Enbridge is the operator for the Line 6B oil pipeline, which ruptured in 2010 in Marshall, Michigan along the Kalamazoo River and was one of the largest inland oil spills in U.S. history.

69.     Enbridge's Line 5 transports, handles and stores up to 22.7 million gallons per day of crude oil or natural gas liquids. For that reason, if there is a spill from Enbridge's Line 5 oil pipeline, that can be expected to cause significant and substantial harm to the environment in the event of an oil discharge into the Great Lakes.  *See* 33 U.S.C. § 1321(j)(5)(E); 49 C.F.R. § 194.103(c).

70.     The Straits of Mackinac and its shorelines support fish and wildlife, and provide public health benefits in the form of recreation and aesthetic enjoyment.

71.     The Straits of Mackinac contain currents up to 1 meter per second that typically reverse direction between eastward flowing and westward flowing every few days.  This oscillating, bi-directional flow means that an oil pipeline spill or other contaminant release in the Straits of Mackinac would quickly move into Lake Huron or Lake Michigan, and potentially into both.   The volume of water

transported through the Straits of Mackinac is as great as 80,000 cubic meters of water per second – 10 times greater than the flow over Niagara Falls.

72.     The Great Lakes contain one-fifth of the world's fresh surface water and supply drinking water to forty million people.

73.     The Enbridge Line 5 oil pipeline has ruptured at least 29 times over the past fifty years in areas outside the Straits of Mackinac.

74.     With respect to the 4.5-mile section of this oil pipeline under the Straits of Mackinac, in 2014, Enbridge discovered dozens of areas on the pipeline where the protective coating was damaged, including several areas of exposed bare metal.

75.     Enbridge failed to disclose this damage for three years.

76.     On April 1, 2018, an anchor strike dented portions of Enbridge's Line 5 oil pipeline under the Straits of Mackinac.

77.     An analysis following the anchor strike uncovered marring on the surface of the oil pipeline.

78.     Enbridge – in consultation with PHMSA – then reduced the pressure in Line 5 by forty percent in what Michigan Agency for Energy spokesperson Nick Assendelft referred to as a "critical precautionary step."  The extent of the oil pipeline's damage highlights the danger of continued operations in the Straits of Mackinac.

*Northern Michigan Area Contingency Plan*

79.     The ACP that covers Sector Sault Ste. Marie is the Northern Michigan Area Contingency Plan ("NMACP").

80.     Under the NMACP, a discharge to coastal waters of more than 100,000 gallons of oil is a "major discharge," and a "worst case discharge" is calculated taking into account facility-specific variables.

81.     The NMACP identifies a Line 5 oil pipeline breach as a potential source of a worst case discharge.

82.     This scenario was ranked as the number one overall worst case discharge for a facility during the 2013 Northern Michigan Area Committee Risk Assessment, on the basis of severity, probability, and impact.

83.     A discharge of oil from the Line 5 pipeline, and particularly a worst case discharge, would significantly harm the unique natural and cultural resources, fish and wildlife (including species protected under the federal Endangered Species Act or their critical habitat), public health, recreation, tourism, or public and private property in the areas around the Straits of Mackinac.  It would endanger drinking water supplies for millions of people and diminish the ecological value of the region.

*Removal of a Worst Case Discharge in the Open Waters of the Great Lakes*

18

84.    On June 6, 2017, the Ninth Coast Guard District Commander, Rear Admiral June E. Ryan (who was recently replaced by Defendant Joanna M. Nunan), approved the NMACP submitted by the Area Committee for Sector Sault Ste. Marie.

85.    In approving the NMACP, the Ninth Coast Guard District Commander certified that the plan was in substantial compliance with all applicable references, including OPA 90.

86.    This approval certified that the NMACP complied with the OPA 90 requirement that this ACP was "**adequate to remove a worst case discharge**, and to mitigate or prevent a substantial threat of such a discharge, from a vessel, offshore facility, or onshore facility operating in or near the area."   33 U.S.C. § 1321(j)(4)(C) (emphasis added).

87.    Under the NMACP, the Coast Guard is the Federal On Scene Coordinator ("FOSC") for the open waters surrounding the Straits of Mackinac. As FOSC, the Coast Guard has conducted spill response exercises in the Straits of Mackinac to assess its readiness to respond to an oil spill in the open waters of the Great Lakes.

88.    Between 2014 and 2017, Coast Guard personnel have publicly stated that the agency is ill-equipped to adequately remove a spill from the open waters of the Great Lakes – let alone one as severe as a worst case discharge.

89.     In April 2015, Commandant of the Coast Guard Adm. Paul Zukunft testified before a Committee of the United States Senate that he was "**not comfortable**" with spill response plans in the Great Lakes.  He  explained "that information is in fact in what we call an Area Contingency Plan, when you look at what a worst case discharge might be . . . we found out during Deepwater Horizon that those Area Contingency Plans were inadequate for a spill of that volume, so I need to do a deeper read on that . . . to say how ready we are for a major spill in the Great Lakes."

90.     In November 2017, Commandant of the Coast Guard Adm. Paul Zukunft then testified under oath before the U.S. Senate Committee on Commerce, Science, and Transportation that "there is still a lot of science that needs to be done. And meanwhile, we have pipelines crossing the lakes. . . . **I would go on the record to say that the Coast Guard is not *semper paratus* for a major pipeline oil spill in the Great Lakes**."

91.     The Coast Guard lacks the technology to recover oil from deep water, including the open waters of the Great Lakes.  Since oil released from a Line 5 breach must travel from the bottom of the Straits to the top, oil may potentially adhere to sediments thereby causing it to remain at the lake bottom instead of floating to the surface.

92.     In a 2013 Coast Guard analysis on bottom oil recovery systems, the Coast Guard explained its limited capability to detect and recover submerged oil in deep waters.  This report stated that agency responders have "limited capability in detection and recovery" for higher profile submerged oil spills, and "[e]xisting systems are inadequate to meet Federal On Scene Coordinator (FOSC) current needs for heavy and sunken oil detection and recovery."

93.     Steven Keck, Contingency Preparedness Specialist for the United States Coast Guard at Sector Sault Ste. Marie, explained in a 2015 workshop that "the science doesn't really exist to recover oil once it gets to the bottom. . . . Right now it's very difficult, [and] it would be extremely difficult in the Straits [of Mackinac] because of the depth and because of the currents that were identified by [NOAA scientist] Dr. Anderson."

94.     Oil spill response efforts in the Straits of Mackinac are highly dependent on weather and water conditions.  According to United States Environmental Protection Agency Federal On-Scene Coordinator Ralph Dollhopf, who oversaw the 2010 clean-up of the Enbridge Line 6B in Marshall, Michigan, "the conditions really aren't being considered" in Enbridge's spill response plan in the Straits of Mackinac.

95.     High wave conditions can hamper or entirely stop spill response efforts.  The Coast Guard's Ninth District Incident Management Advisor Jerry

Popiel stated that "when you get above 3-, 4-, 5-foot seas – definitely at 5 feet – you are beyond where you can safely deploy [oil-containment booms and skimmers] and have them do any good."

96.     The Coast Guard's Contingency Preparedness Specialist Steven Keck also acknowledged that response efforts are called off completely once waves reach a certain height.  Likewise, crews cannot operate spill recovery in the Straits at night.

97.     Icy conditions also obstruct spill response efforts.  At the same 2015 workshop referenced above, Specialist Keck also stated, "It's very difficult to respond in icy conditions. We did drills in 2011, 12 and 13 in the Straits of Mackinac and we found out a lot of the things we thought might work didn't work. This is evolving technology."

98.     Mr. Keck also confirmed that that ice breakers are not always readily available in the Straits of Mackinac to assist the Coast Guard's oil spill response efforts.  These ice breakers might have to travel up to 24 or 48 hours from other locations to reach the response area.

99.     In the NMACP itself, the Coast Guard stated that it cannot respond to a discharge in the open waters of Lake Superior adequately enough to meet OPA 90 requirements.  Since May 1999, tank vessels have been prohibited from

transiting the U.S.-side of Lake Superior due to failure to meet OPA 90 response equipment requirements.

100.   The Coast Guard has not indicated how spill response in Lake Superior is distinguishable from oil spill responses in the Straits of Mackinac, where oil would rapidly disperse into the open waters of Lake Michigan and Lake Huron.

## CLAIMS FOR RELIEF

### Count 1 – Administrative Procedure Act

101.   Plaintiff re-alleges and incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1 through 100.

102.   The Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

103.   The Administrative Procedure Act also requires an agency action to be held unlawful or set aside if it is "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."  5 U.S.C. § 706(2)(F).

104.   Defendants approved the NMACP even though the NMACP is not adequate to remove a worst case discharge in the open waters of the Great Lakes, as required by OPA 90.  This agency action violates the requirements of OPA 90

as applied to oil pipelines operating in the open waters of the Great Lakes.  33 U.S.C. § 1321(j)(4)(C)(i).

105.   By approving a portion of an ACP that is non-compliant with the requirements of OPA 90, the Coast Guard failed to consider the factors under the statute that Congress directed it to consider. The Coast Guard's action in this respect is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.  5 U.S.C. § 706(2).

106.   Accordingly, Defendants' approval of the portion of the NMACP that applies to oil pipelines operating in the open waters of the Great Lakes must be declared legally invalid.

## Count 2 – Oil Pollution Act of 1990

107.   Plaintiff re-alleges and incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1 through 100.

108.   Under OPA 90, an oil pipeline operating in the open waters of the Great Lakes must have an FRP, and that FRP must be consistent with the relevant ACP.  33 U.S.C. §§ 1321(j)(5)(E); 1321(j)(5)(D)(i).

109.   The NMACP is unlawful as applied to any oil pipeline facility in the open waters of the Great Lakes because the NMACP is not adequate to remove a worst case discharge, as required by OPA 90.  33 U.S.C. § 1321(j)(4)(C)(i).

110.  Because the aforementioned portions of the NMACP must be set aside, any FRP for an oil pipeline facility operating in the open waters of the Great Lakes is not consistent with the ACP and violates OPA 90.  Therefore, any FRP is invalid if it governs an oil pipeline in the area of the Great Lakes covered by the NMACP.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in favor of the Plaintiffs and grant the following relief:

1.  Declare that the Coast Guard violated the Oil Pollution Act of 1990 and the Administrative Procedure Act by acting in a manner that is arbitrary, capricious, or otherwise not in accordance with the law when it approved the NMACP;

2.  Declare that an FRP for an oil pipeline facility operating in the open waters of the Great Lakes violates the Oil Pollution Act of 1990 and the Administrative Procedure Act;

3.  Grant Plaintiffs the costs of litigation (including reasonable attorney and expert witness fees) incurred in prosecuting this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

4.  Grant such other relief as this Court deems just and equitable.

Dated: August 22, 2018                    Respectfully submitted,


                                          /s/ Margrethe Kearney_____

                                          Margrethe Kearney
                                          Environmental Law & Policy Center
                                          1514 Wealthy St. SE
                                          Grand Rapids, Michigan 49506
                                          (773) 726-8701
                                          mkearney@elpc.org
                                          P80402

                                          Howard A. Learner
                                          Andrene Dabaghi
                                          Environmental Law & Policy Center
                                          35 East Wacker Drive, Suite 1600
                                          Chicago, Illinois 60601
                                          (312) 673-6500
                                          HLearner@elpc.org
                                          ADabaghi@elpc.org

                                          *Attorneys for Plaintiffs*
                                          *Environmental Law & Policy Center*
                                          *and National Wildlife Federation*