UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ENVIRONMENTAL LAW & POLICY
CENTER, and NATIONAL WILDLIFE
FEDERATION,

       Plaintiffs,

Case No. 18-cv-12626

v.

Honorable Thomas L. Ludington
Magistrate Judge Patricia T. Morris

UNITES STATES COAST GUARD,
and REAR ADMIRAL JOANNA M.
NUNAN in her official capacity as
Coast Guard District Commander,

       Defendants.

_____/

## ORDER DIRECTING SUPPLEMENTAL BRIEFING ON PLAINTIFFS' MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

On August 22, 2018, Plaintiffs Environmental Law & Policy Center (ELPC), and National Wildlife Federation (NWF) filed a complaint against Defendants United States Coast Guard and Rear Admiral Joanna M. Nunan in her official capacity as Coast Guard District Commander. Compl., ECF No. 1. Plaintiffs allege that the Coast Guard's Northern Michigan Area Contingency Plan (NMACP), certified by the Ninth Coast Guard District Commander, Rear Admiral June E. Ryan, on June 6, 2017, is inadequate to respond to a worst-case discharge, and that Defendants wrongfully approved the NMACP in violation of the Administrative Procedure Act (Count I) and the Oil Pollution Act of 1990 (OPA) (Count II). *Id.* ¶ 101–110.

On October 15, 2018, Enbridge, an owner of two oil pipelines known as "Line 5" and the primary risk addressed by the NMACP, moved to intervene as a defendant. ECF No. 12. As the owner and operator of Line 5, Enbridge was entitled to intervention as of right. *See* Fed. R. Civ.

P. 24(a)(2). The motion was unopposed and was granted on November 1, 2018. ECF No. 17. The administrative record was filed on December 17, 2018. ECF No. 20.

On February 15, 2019, Plaintiffs moved to supplement the administrative record to add Coast Guard Commandant Adm. Paul Zukunft's testimony before the U.S. Senate Subcommittee on Oceans, Atmosphere, Fisheries, and Coast Guard on November 16, 2017, some five months after Rear Admiral Ryan's certification of the NMACP. ECF No. 24. A statement by Admiral Zukunft made before the committee in April of 2015 is included in the administrative record. Defendant responded on March 1, 2019. ECF No. 25.

## I.

Some background on the Oil Pollution Act of 1990, 33 U.S.C. 2701 et seq., is necessary to address the legal context of Plaintiff's motion. On March 24, 1989, the Exxon Valdez spilled over 11 million gallons of Alaskan crude into the water of Prince William Sound. Although the environmental damage and massive cleanup efforts were the most visible effects of this casualty, one of the most important outcomes was the enactment of the OPA

The OPA established new requirements and extensively amended the Federal Water Pollution Control Act (33 U.S.C. 1301 et. seq.) to provide enhanced capabilities for oil spill response and natural resource damage assessment. The OPA also amended the Clean Water Act and addressed the wide range of problems associated with preventing, responding to, and paying for oil pollution incidents in navigable waters of the United States. It created a comprehensive prevention, response, liability, and compensation regime to deal with vessel- and facility-caused oil pollution to U.S. navigable waters. OPA greatly increased federal oversight of maritime oil transportation, while providing greater environmental safeguards by:

- Setting new requirements for vessel construction and crew licensing and manning,

- Mandating contingency planning,

- Enhancing federal response capability,

- Broadening enforcement authority,

- Increasing penalties,

- Creating new research and development programs,

- Increasing potential liabilities, and

- Significantly broadening financial responsibility requirements.

Title I of OPA established new and higher liability limits for oil spills, with commensurate changes to financial responsibility requirements. It substantially broadened the scope of damages, including natural resource damages (NRDs), for which polluters are liable. It also authorized the Oil Spill Liability Trust Fund (OSLTF) up to $1 billion to pay for expeditious oil removal and uncompensated damages up to $1 billion per incident.[1] The primary source of revenue for the fund is a five-cents per barrel fee on imported and domestic oil. Collection of this fee ceased on December 31, 1994, due to a "sunset" provision in the law. Other revenue sources for the fund include:

- interest on the fund,

- cost recovery from the parties responsible for the spills, and

- any fines or civil penalties collected.

The OPA streamlined and strengthened EPA's ability to prevent and respond to catastrophic oil spills. The OPA requires oil storage facilities and vessels to submit to the Federal government plans detailing how they will respond to large discharges. EPA has published regulations for aboveground storage facilities; the Coast Guard has done so for oil tankers.

---

[1] https://www.uscg.mil/Mariners/National-Pollution-Funds-Center/About_NPFC/opa/

The OPA also requires the development of Area Contingency Plans to prepare and plan for oil spill response on a regional scale.[2]

Pursuant to 33 U.S.C. § 1321(j) (National Response System):

Consistent with the National Contingency Plan required by subsection (c)(2) of this section, as soon as practicable after October 18, 1972, and from time to time thereafter, the President shall issue regulations consistent with maritime safety and with marine and navigation laws (A) establishing methods and procedures for removal of discharged oil and hazardous substances, (B) establishing criteria for the development and implementation of local and regional oil and hazardous substance removal contingency plans, (C) establishing procedures, methods, and equipment and other requirements for equipment to prevent discharges of oil and hazardous substances from vessels and from onshore facilities and offshore facilities, and to contain such discharges, and (D) governing the inspection of vessels carrying cargoes of oil and hazardous substances and the inspection of such cargoes in order to reduce the likelihood of discharges of oil from vessels in violation of this section.

33 U.S.C. § 1321(j)(4), in turn (Area Committees and Area Contingency Plans) provides:

**(A)** There is established for each area designated by the President an Area Committee comprised of members appointed by the President from qualified—
   **(i)** personnel of Federal, State, and local agencies; and
   **(ii)** members of federally recognized Indian tribes, where applicable.
**(B)** Each Area Committee, under the direction of the Federal On-Scene Coordinator for its area, shall—
   **(i)** prepare for its area the Area Contingency Plan required under subparagraph (C);
   **(ii)** work with State, local, and tribal officials to enhance the contingency planning of those officials and to assure preplanning of joint response efforts, including appropriate procedures for mechanical recovery, dispersal, shoreline cleanup, protection of sensitive environmental areas, and protection, rescue, and rehabilitation of fisheries and wildlife, including advance planning with respect to the closing and reopening of fishing areas following a discharge; and
   **(iii)** work with State, local, and tribal officials to expedite decisions for the use of dispersants and other mitigating substances and devices.
**(C)** Each Area Committee shall prepare and submit to the President for approval an Area Contingency Plan for its area. The Area Contingency Plan shall—

---

[2] https://www.epa.gov/laws-regulations/summary-oil-pollution-act

**(i) when implemented in conjunction with the National Contingency Plan,  be adequate to remove a worst-case discharge, and to mitigate or prevent a substantial threat of such discharge, from a vessel, offshore facility, or onshore facility operating in or near the area**

**(ii)** describe the area covered by the plan, including the areas of special economic or environmental importance that might be damaged by a discharge;

**(iii)** describe in detail the responsibilities of an owner or operator and of Federal, State, and local agencies in removing a discharge, and in mitigating or preventing a substantial threat of a discharge;

**(iv)** list the equipment (including firefighting equipment), dispersants or other mitigating substances and devices, and personnel available to an owner or operator, Federal, State, and local agencies, and tribal governments, to ensure an effective and immediate removal of a discharge, and to ensure mitigation or prevention of a substantial threat of a discharge;

**(v)** compile a list of local scientists, both inside and outside Federal Government service, with expertise in the environmental effects of spills of the types of oil typically transported in the area, who may be contacted to provide information or, where appropriate, participate in meetings of the scientific support team convened in response to a spill, and describe the procedures to be followed for obtaining an expedited decision regarding the use of dispersants;

**(vi)** describe in detail how the plan is integrated into other Area Contingency Plans and vessel, offshore facility, and onshore facility response plans approved under this subsection, and into operating procedures of the National Response Unit;

**(vii)** include a framework for advance planning and decision making with respect to the closing and reopening of fishing areas following a discharge, including protocols and standards for the closing and reopening of fishing areas;

**(viii)** include any other information the President requires; and

**(ix) be updated periodically by the Area Committee.**

(emphasis added).

An Area Contingency Plan (ACP) is a reference document prepared for the use by all agencies engaged in responding to environmental emergencies within a defined geographic area. An ACP may also contain Sub-Area and Geographic Response Plans, which may have more limited scope than the ACP itself. An ACP is a mechanism to ensure that all responders have

access to essential area-specific information and promotes inter-agency coordination to improve the effectiveness of responses.[3]

Under the OPA and the National Contingency Plan (NCP), all U.S. territory is divided into jurisdictional zones for purposes of removal and response actions. The U.S. Coast Guard is designated the lead agency for planning and response in the coastal zone and certain major inland water bodies, and EPA is designated the lead for the inland zone, with certain exceptions for areas managed by the Department of Defense. The EPA also has a role in coastal zone planning, specifically regarding oil spill countermeasure concurrences and authorizations. Coast Guard-lead coastal plans and EPA-lead inland plans covering adjacent areas are to be compatible. *Id.*

When implemented in conjunction with the NCP, the ACP must be adequate to address a worst-case discharge and mitigate or prevent a substantial threat of such discharge. Additionally, ACPs may provide guidelines for conducting specific tasks such as:

- sampling,
- classifying,
- segregation, and
- temporary staging of recovered waste.

Other specific tasks listed include identifying prior state disposal approval, various waste disposal options and a hierarchy of preferences for disposal alternatives (40 CFR 300.310(c)).

The area covered by the ACP may be defined by geographic features, jurisdictional boundaries, or both, at the discretion of the Area Committee (AC). Under the direction of an OSC and subject to approval of EPA, within the inland zone, each AC is to develop an ACP for

---

[3] https://www.epa.gov/oil-spills-prevention-and-preparedness-regulations/area-contingency-planning

its designated area. This plan, when implemented in conjunction with other provisions of the NCP, should be adequate to remove a worst-case discharge under 40 CFR 300.324, and to mitigate or prevent a substantial threat of such a discharge, from a vessel, offshore facility or onshore facility operating in or near the area. Within the ACP boundaries, sub-areas may be defined where there are unique circumstances that may require tailored response strategies.

After the AC has developed the initial inventory of sensitive areas and potential sources, it then considers the general response strategies with special consideration given to potential worst-case discharges. Oil spill countermeasures include dispersants, in-situ burning (including accelerants), bio-remediation, surface washing agents, solidifiers and other methods for reducing the impact of oil to the environment.

Facilities that could reasonably be expected to cause "substantial harm" to the environment by discharging oil into or on navigable waters are required to prepare and submit Facility Response Plans (FRPs). Facilities that could cause "significant and substantial harm" are required to have their plans approved by an EPA Regional Administrator (RA). Facilities may be identified as posing substantial harm either through a self-identification process, or by the determination of an RA. These include facilities with the potential for large-scale discharges or releases (such as pipelines, large storage and manufacturing facilities, and railroads).

In the event of an oil spill, the Facility Response Plan (FRP) is immediately activated. Local, area, or regional plans may also be put into motion, depending on the nature of the spill. According to the OPA, certain facilities that store and use oil are required to prepare plans to respond to a worst-case discharge of oil. OPA also sets specific requirements for the development of such plans. In response, EPA developed regulations in 1994 that implement the facility response planning requirements of OPA. These regulations provide flexibility so that

- 7 -

facility owners and operators are not required to create a new response plan if they have

an existing plan. An FRP must be consistent with the Coast Guard's ACP. 33 U.S.C. §

1321(j)(5)(D)(i).[4]

## II.

On June 6, 2017, Ninth Coast Guard District Commander, Rear Admiral June E. Ryan,

certified the Coast Guard's Northern Michigan Area Contingency Plan (NMACP). The NMACP

is a 217-page document. At page 26, the NMACP sets forth the specific geographic boundaries

of the area covered by the plan. It covers over 20 counties in northern Michigan, and surrounding

waterways, roughly from Marquette County to the Northwest to Leelanau County to the

Southwest to Alpena County to the Southeast to Chippewa County to the Northeast.   The

introduction to the plan reads as follows:

> This Area Contingency Plan (ACP) describes the strategy for a coordinated
> federal, state, tribal and local response to a discharge or substantial threat of
> discharge of oil, or a release or substantial threat of release of hazardous
> substance(s) within the boundaries of Sector Sault Sainte Marie's Coastal Zone.
> This ACP addresses response to an average most probable discharge (AMPD), a
> maximum most probable discharge (MMPD), and a worst-case discharge (WCD).
> Planning for these scenarios covers the expected range of spills possible in the
> coastal zone covered by this ACP.
>
> For purposes of this plan, the AMPD is the average spill in the area based on the
> available historical data. The MMPD is also based on historical spill data, and is
> the discharge most likely to occur taking into account such factors as the size of
> the largest recorded spill, traffic flow through the area, hazard assessment, risk
> assessment, seasonal considerations, spill histories and operating records of
> facilities and vessels in the area. The WCD from a vessel or facility is the largest
> foreseeable discharge in adverse weather conditions. In addition, approximately
> 500 miles of oil product transmission pipelines run through this area from
> northwest Canada and Wisconsin through the Upper Peninsula of Michigan and
> Northern Lower Michigan to points south. The worst-case discharge from a
> pipeline would be its entire contents between two automatic shut-off locations as
> the pipeline transits along, over, under or through a navigable water or adjacent

---

[4] https://www.epa.gov/sites/production/files/2018-10/documents/acp_handbook_10-18-2018.pdf

shoreline (49 CFR 194). Finally, over 1200 miles of railroad pass through this area. The worst-case discharge for a rail shipment would be the discharge of the entire contents of a unit train, for planning purposes would be the total discharge of all contents of the entire train.

This plan shall be used as a framework for response mechanisms to evaluate shortfalls and weakness in the response structure before an incident, and as a guide for reviewing vessel and facility response plans required by the Oil Pollution Act of 1990 (OPA 90). The review for consistency should address, at a minimum, the economically, environmentally and culturally sensitive areas within the zone, response equipment (quantity and type) available within the zone (this includes federal, state, tribal and local government and industry owned equipment); response personnel available; equipment and personnel needs compared to those available, protection strategies, etc. This plan is written in conjunction with National Oil and Hazardous Substances Contingency Plan (NCP) 40 CFR Part 300 and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) US EPA CERCLA.[5]

The stated purpose of the NMACP is as follows:

The ACPs describe the strategy for a coordinated federal, state, tribal and local response to any vessel, offshore facility, submerged pipeline or waterfront facility within the Great Lakes that experience:

- A discharge or substantial threat of discharge of oil
- A release or threat of release of a hazardous substance
- An exposure to or threat of exposure to a chemical, biological, radiological, nuclear or explosive (CBRNE) event
- One of the above incidents combined with a threat of an act of terrorism

Discharges, releases or exposure incidents can occur for various reasons and the causes can include human error, mechanical failure, fire, and explosion and/or hostile or terrorist activity. In the writing of this plan, a number of factors were considered such as:

- Spill histories
- Vessel traffic flow through the area
- Hazard and risk assessments
- Seasonal considerations
- The maximum product capacities and the operating records of facilities and vessels within the area

The ACPs shall be used as:

---

[5] https://homeport.uscg.mil/Lists/Content/Attachments/20682/NMACP.pdf, at 13.

• A resource and response guide during actual spills or incidents for orderly and effective response actions in the coastal zone
• A framework for response mechanisms to evaluate shortfalls and weaknesses in the response structure before a spill or incident
• A guide for reviewing vessel and facility response plans required by OPA 90, to ensure consistency.

This plan consists of a base plan and incident annexes. The annexes are:
• GRSs
• Hazardous Substance
• Weapons of Mass Destruction (WMD)/Chemical, Biological, Radiological, Nuclear, and Explosive (CBRNE)
• Salvage and Marine Fire Fighting (SMFF)
• Area Maritime Security (AMS)/Terrorism
• CANUSLAK (Great Lakes Operational Supplement to the Joint Marine Contingency Plan)
• Fish and Wildlife (F&W)
• Externa

*Id.* at 16. The NMACP provides the following description regarding regional incident response:

A Regional Response Team (RRT) acts as a regional planning and coordination body for preparedness and response actions. The Co-Chairs of the Region 5 RRT are the Chief of the Emergency Response Branch, EPA Region 5; and the Incident Management Preparedness Advisor, Response Division, (IMPA) Ninth Coast Guard District. The Region 5 RRT membership includes representatives appointed by the Governor from each State and the designated regional representatives of the following agencies:

• Department of Agriculture (DOA)
• Department of Commerce (DOC)
• Department of Defense (DOD)
• Department of Energy (DOE)
• Federal Emergency Management Agency (FEMA)
• General Services Administration (GSA)
• Department of Health and Human Services (HHS)
• Department of Interior (DOI)
• Department of Justice (DOJ)
• Department of Labor (DOL)
• Nuclear Regulatory Commission (NRC)
• Department of State (DOS)
• Department of Transportation (DOT)

The principal components of the Region 5 RRT are a standing RRT and incident-specific RRTs. The standing RRT consists of designated representatives from

- 10 -

each participating federal agency listed above and each State. Each incident-specific RRT is formed from the standing team when the RRT is activated for a response and consists of representatives of appropriate local governments, state agencies and federal agencies.

Activation of the RRT: An incident-specific RRT may be activated upon request from the FOSC, or from any RRT representative, to the Co-Chair of the RRT, when a discharge or release:
> • Exceeds the response capabilities available to the FOSC in the place where it occurs;
> • Transects state, regional and/or international boundaries; or
> • Poses a substantial threat to public health or welfare, to the environment, or to regionally significant amounts of property.

It is the policy of the RRT that response actions on non-federal lands should be monitored or implemented by the most immediate level of government with authority and capability to conduct such activities. The first level of response will generally be the RP, followed by local government agencies, and followed by state agencies when local capabilities are exceeded. When incident response is beyond the capability of the state response, USEPA or USCG is authorized to take response measures deemed necessary to protect public health or welfare or the environment from discharges of oil or releases of hazardous substances, pollutants, or contaminants. The need for federal response is based on evaluation by the FOSC. Requests for RRT activation shall subsequently be confirmed in writing. Local requests for RRT activation must be made through the State RRT member. The Region 5 Regional Response Team maintains the Region 5 Regional Contingency Plan/Area Contingency Plan (RCP/ACP). More information on the Region 5 RRT and the Region 5 RCP/ACP can be found on the Region 5 RRT website at http://rrt5.org/RCPACPMain.aspx

*Id.* at 43. Of particular relevance to the ELPC's challenge in this case, the NMACP contains the

following description of a worst-case facility discharge:

**Worst Case Discharge (Facility)**. The largest sources of a worst-case discharge into navigable waters are the US Oil Co. facility and the Nobel Petro facility. US Oil Co. is located on the Cheboygan River, which flows into Lake Huron. The facility is within U.S. EPA Region V's FOSC responsibility. The terminal has several large storage tanks and is situated up gradient from the Black River. WCD is estimated to be 46,143 bbls (1,938,006 gallons). Product type and potential cause of discharge are considered SSI and is located in Appendix K with proper authorization. The NoblePetro facility is located in Rogers City, MI adjacent to Lake Huron. The facility has one main storage tank. WCD is estimated to be 80,000 bbls (3,360,000 gallons). **Enbridge Energy also has a pipeline that crosses the Straits of Mackinac five miles west of the Mackinac Bridge. This pipeline is a potential source of a WCD. Factoring in the element of**

- 11 -

**probability, a full breaching of both 20" lines crossing the Straits has the potential to release 6,428 bbls (269,976 gallons) provided the Emergency Flow Restricting Device (EFRD) closes properly after indication of a release. It is estimated up to 19,164 bbls (804,888 gallons) could be released if the EFRD fails to close in normal time. This is based on an assumed 13-minute time frame for event recognition and remote operated EFRD closures, assuming full line fill volume in the two lines. Products in Line 5 are primarily light and medium crude oil and natural gas liquids. This scenario was ranked #1 overall during the 2013 NMAC Risk Assessment based on Severity, Probability and Impact.**

*Id.* at 214 (emphasis added).

### III.

### A.

Admiral Paul F. Zukunft is the former Commandant of the U.S. Coast Guard.[6] The Commandant is the highest-ranking member of the United States Coast Guard. In April of 2015, Adm. Zukunft testified before the U.S. Senate Subcommittee on Oceans, Atmosphere, Fisheries, and the Coast Guard. The Subcommittee is under the purview of the U.S. Senate Committee on Commerce, Science, & Transportation. The Subcommittee is responsible for "legislation and oversight of science, technology, engineering, and math research, development, and policy; standards and measurement, and matters that impact our oceans, coasts, and inland waterways including: coastal zone management; marine fisheries and marine mammals; oceans, weather, and atmospheric activities." The relevant testimony was as follows:

> Senator PETERS. And, from the report, it seems as if you are concerned about some of those plans in the Great Lakes. And I know there have been some issues related to the Pipeline and Hazardous Materials Safety Administration, PHMSA, and we are going to have their reauthorization coming up in this committee, as well. And there have been some significant gaps that have been identified in their ability to respond or to put the plans forward.

---

[6] On June 1, 2018, Admiral Zukunft was relieved of command by Admiral Karl Schulz.

How comfortable are you with the plans in the Great Lakes, particularly—not just with the Straits of Mackinac pipeline, but we have others. So I guess a couple questions: Do you have enough information regarding those pipelines that cross this pristine environment? And do you feel comfortable that the partners that you work with are in a position to respond as quickly as necessary?

Admiral ZUKUNFT. And until I have actually seen the plans, Senator, I would have to say, no, I am not comfortable. And the reason I say that is that information is then factored into what we call an area contingency plan, when you look at what a worst-case discharge might be and then what equipment do you have to have pre-staged to enable a response to a spill of that magnitude. And we found out, again, during Deepwater Horizon, that those area contingency plans were inadequate for a spill of that volume.

**So I need to do a deeper read on that, and we owe you a response after we review that material, our area contingency plans, to say how ready are we for a major spill in the Great Lakes**.

Senator PETERS. Well, I appreciate that and look forward to working closely with your office on that. Because, obviously, we can't make a mistake here, because there is no going back once that happens.

R. at USCG_00000254-55 (emphasis added).

## B.

On November 16, 2017, some two and a half years later, Adm. Zukunft testified again before the U.S. Senate Subcommittee on Oceans, Atmosphere, Fisheries, and the Coast Guard. ECF No. 24-2. Present at the hearing were Senators Sullivan, Wicker, Johnson, Fischer, Inhofe, Lee, Gardner, Young, Thune, Peters, Booker, Cantwell, Blumenthal, Schatz, Markey, Baldwin, and Nelson, as well as witnesses Adm. Zukunft, Etta Kuzakin (Agdaagux Tribal Council), Guy Meadows (Michigan Technological University), and Lee Smithson (Mississippi Emergency Management Agency).

At the outset of the November 16, 2017 hearing, Senator Sullivan gave some opening marks, noting that the hearing would focus on the readiness of the U.S. Coast Guard, specifically "how a string of recent natural disasters has affected our nation's only multi-mission military

force's ability to continue operations at such a high tempo." Senator Sullivan also discussed his personal experience observing the unique challenges the Coast Guard faces in its operations in King Cove, Alaska. ECF No. 24-2 at 2. To that end, the Subcommittee heard testimony from Etta Kuzakin of the Agdaagux Tribal Council of King Cove, Alaska. *Id.* at 52. She testified concerning the challenges and dangers Coast Guard medevacs face in King Cove, such as gale force winds, snow squalls, and dense fog. *Id.* Dr. Guy Meadows of Michigan Technological University also testified concerning challenges facing the northern ice-bound seas, such as maintaining navigable waters for commercial use, and challenges facing the Great Lakes such as toxic and nutrient pollution, invasive species introduction, and fishery degradation. *Id.* at 55-56.

Ranking member Senator Peters also gave some opening remarks. He noted that in recent years the Great Lakes have seen record levels of ice cover, threatening to interrupt commercial shipping that is vital to the Michigan economy. He also noted the importance of the icebreaking services provided by the Coast Guard which helps keep Michigan's ports, cities, and towns open for business during the winter months. *Id.* at 6. Additionally, Senator Peters noted that a 64-year old oil pipeline runs under the Straights of Mackinac which, according to a University of Michigan study, is the worst possible location across the Great Lakes for a potential oil spill. *Id.*

Adm. Zukunft also gave an opening statement. He discussed the Coast Guard's efforts in responding to Hurricane Harvey, Irma, Maria, and how those efforts depleted resources available to the Coast Guard to respond to other demands throughout the country. Senator Sullivan began questioning Adm. Zukunft regarding King Cove, Alaska. Senator Peters questioned Adm. Zukunft about various matters affecting the Great Lakes. At around page 18 of the 73-page hearing transcript, Adm. Zukunft and Senator Peters began discussing the need to recapitalize the

- 14 -

fleet of 140-foot icebreaking tugs in the Great Lakes, which then transitioned into a discussion

about the readiness of the Coast Guard to respond to an oil spill in the Great Lakes:

> ZUKUNFT: Yes, sir, Senator. We're making great strides in extending the service life on those 140 foot icebreaking tugs that are doing great work up in the Great Lakes. We had a bit of a reprieve these last two ice seasons so we're not putting additional wear and tear. So we're coming back on step, but that only buys us about 10 years. We're going to have to recapitalize that 140 foot fleet and look at parent craft designs. I was out in Helsinki a week ago to see what Finland is building. Very capable, using Azipods instead of propellers, and looking at what the state of the art is, in terms of icebreaking. So as we look at those ships timing out, there is – there's better capability-- and those ships do one thing and they do one thing only, they break ice. And the same thing in Finland, they do one thing and they break ice. There are some great parent craft designs and so we build out our 20 year capital investment. We need to look at those 140 foot icebreaking tugs having much more capability than the ships that we have in our inventory right now. The good news is, for a very modest cost, you know, this can deliver, you know, up to the same capability of our Great Lake icebreaker the Mackinac. So that's what we're looking in the out years, as we have bought ourselves some time with our service life extension program.

> PETERS: Although it's bought us some time, what are -- where -- what is the critical timeline when do we need to make these decisions?

> ZUKUNFT: We're probably talking 2030 and beyond. I will ...

> PETERS: When they come into service 2030?

> ZUKUNFT: When we'll have to -- again, that will be condition- based on --you know, it will vary one ice season to the next, but conservatively speaking, 2030, we need to start looking at design work and looking at a modernization program.

> Senator PETERS: Also, Admiral, back in March we discussed the concerns about oil and freshwater and given the fact that the Coast Guard has primary responsibility to oversee a clean-up and the concern that I have and many folks in my state have regarding an oil spill, particularly in the Straights [sic] of Mackinac and the devastating impact that would have on the lakes and also the fact that we don't have a whole lot of research into how we clean up fresh water.

> We have a great body of work in terms of salt water, we have a lot of proven techniques to clean it up in salt water and salt water has the advantage of having microorganisms that actually break down oil that do not exist in freshwater. So it creates a tremendous challenge for clean-up.

- 15 -

Since we've talked in March, can you give me an update on the research being done at the Coast Guard to deal with freshwater spills and what do we need? What additional resources do you need because in March you mentioned you were not comfortable that we could clean up a major spill in the Great Lakes now, given the current state of resources, what do you need and how concerned are you?

Admiral ZUKUNFT. Yes. I can't put a dollar figure on it, but we do need to make further investments in our research and development. We did receive a significant plus up this last year, but that was to address unmanned aerial systems or remotely piloted systems, if you will.

We are paying very close attention to two anomalies when it comes to oil spill recovery. Oil in an iced environment and then tar sand that has the specific gravity of water and it sinks. And then, how do you recover that? We're using a facility in Leonardo, New Jersey. It's a several hundred yard long tank that you can actually spill water-- oil in.

You can use different water, you can use fresh, salt. You can freeze it. So, we've been using that facility to do proof of concept work. We recognize that there are research labs and subject matter experts in the Great Lakes.

And so, if we're going to do research and development as we look at our area contingency plans in an oil spill, all things are local. And so, we need to make sure that we have full inclusiveness with subject matter experts who are very familiar with this. You've got water intakes, drinking water for communities and the like. What is -- do you use a dispersant or not and what are the harmful effect [sic] of doing that.

So, there's still a lot of science that needs to be done, and meanwhile, we have pipelines crossing the lakes and **I will go on the record to say that the Coast Guard is not Semper Paratus for a major pipeline oil spill in the Greater [sic] Lakes. More science needs to be done in that regard and I know you understand that quite well.**

*Id.* at 17-20 (emphasis added).

Plaintiff moves to supplement the administrative record to include this bolded testimony above, which Plaintiff believes is relevant to its claims that the NMACP violates the Oil Pollution Act of 1990 as well as the Administrative Procedure Act.

- 16 -

**IV**.

Judicial review of administrative decisions under the APA is limited to the full administrative record that was before the agency at the time the agency made its decision. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997). Supplementation of the administrative record is "rare and requires 'exceptional circumstances.'" *Little Travers Lake Prop. Owners Ass'n v. Nat'l Park Serv.*, 883 F.3d 644, 657 (6th Cir. 2018). "Courts have suggested that in order to justify supplementation, a plaintiff must make a 'strong showing' of bad faith." *Sierra Club v. Slater*, 120 F.3d 623, 638 (1997).

Sixth Circuit case law also supports the notion that "[S]upplementation of the administrative record may be appropriate when . . . a court needs background information to determine whether the agency has considered all relevant factors. A strong showing of bad faith may also justify supplementation of the record." *Little Traverse Lake Prop. Owners Ass'n v. Nat'l Park Serv.*, 883 F.3d 644, 657–58 (6th Cir. 2018). Supplementation may also be appropriate where the agency "deliberately or negligently excluded certain documents." *Latin Ams. For Soc. & Econ. Dev. V. Adm'r of the FHWA*, 756 F.3d 447, 464–65 (6th Cir. 2014).

**V**.

Plaintiffs acknowledge that Adm. Zukunft's November, 2017 senate testimony post-dates the Coast Guards decision to approve the NMACP by 5 months. Nevertheless, Plaintiffs contend that Adm. Zukunft's testimony is highly relevant in evaluating the Coast Guard's readiness to respond to a major pipeline spill in the Great Lakes, as well as whether the Coast Guard examined all relevant factors when it approved the NMACP in June 2017.

Plaintiffs also argue that Adm. Zukunft's testimony constitutes the opinion of the Coast Guard because he was its highest-ranking member. Thus, Plaintiffs argue, if Adm. Zukunft believed as of November 2017 that the Coast Guard was not "Semper Paratus" for a major spill in the Great Lakes, that it was also the Coast Guard's position on the issue as well.

Plaintiffs also argue that Adm. Zukunft's November, 2017, testimony provides relevant background information necessary to make sense of Adm. Zukunft's earlier testimony from April 2015 (which is included in the administrative record). The earlier testimony was as follows:

> Senator PETERS. And, from the report, it seems as if you are concerned about some of those plans in the Great Lakes. And I know there have been some issues related to the Pipeline and Hazardous Materials Safety Administration, PHMSA, and we are going to have their reauthorization coming up in this committee, as well. And there have been some significant gaps that have been identified in their ability to respond or to put the plans forward.
>
> How comfortable are you with the plans in the Great Lakes, particularly—not just with the Straits of Mackinac pipeline, but we have others. So I guess a couple questions: Do you have enough information regarding those pipelines that cross this pristine environment? And do you feel comfortable that the partners that you work with are in a position to respond as quickly as necessary?
>
> Admiral ZUKUNFT. And until I have actually seen the plans, Senator, I would have to say, no, I am not comfortable. And the reason I say that is that information is then factored into what we call an area contingency plan, when you look at what a worst-case discharge might be and then what equipment do you have to have pre-staged to enable a response to a spill of that magnitude. And we found out, again, during Deepwater Horizon, that those area contingency plans were inadequate for a spill of that volume.
>
> **So I need to do a deeper read on that, and we owe you a response after we review that material, our area contingency plans, to say how ready are we for a major spill in the Great Lakes**.
>
> Senator PETERS. Well, I appreciate that and look forward to working closely with your office on that. Because, obviously, we can't make a mistake here, because there is no going back once that happens.

Mot. at 2-3 (emphasis in original).

Plaintiffs argue that "The April 2015 testimony, standing alone, hinders the Court's ability to determine whether the Coast Guard approved an oil spill response plan that is adequate as required under OPA 90." Mot. at 5. Plaintiffs further argue that "The November 2017 testimony contains the outcome of the Commandant's 'deeper read' promised to Senator Peters two years earlier in April 2015." *Id.* at 5. Defendants argue in response that this is not true, in that the April 2015 testimony is specifically discussing the NMACP, whereas the November 2017 testimony was discussing a variety of different topics.

Indeed, as the above summary at section II. reveals, the November 2017 hearing testimony was not focused on the June 2017 NMACP. The testimony involved several senators and several witnesses discussing a variety of challenges the Coast Guard faces across the country in responding to natural disasters including hurricanes. Senator Peter's questioning of Adm. Zukunft was specifically directed at the Great Lakes, but even that testimony covered a variety of different topics, many of which were unrelated to the Coast Guard's readiness to respond to oil spills. Moreover, even during the limited discussion of the Enbridge Energy Oil Pipeline under the Straights of Mackinac, neither Adm. Zukunft nor Senator Peter's specifically made any reference to the June 2017 NMACP. Nor did they reference Senator Peter's prior discussion with Adm. Zukunft in April 2015 in which Adm. Zukunft promised Senator Peters a "deeper read" on that issue.

Even if Plaintiff is correct, and the Nov. 2017 testimony was a follow up to the "deeper read" Adm. Zukunft promised earlier, there is insufficient context from the Nov. 2017 testimony alone from which to derive any reasoned conclusion. Although a "deeper read" was contemplated, there was no subsequent explanation by Adm. Zukunft about what additional research was done, if any. There was also no explanation of whether Adm. Zukunft's testimony

was meant as a substantive criticism of the certified plan itself (the NMACP) as opposed to the Coast Guard's general readiness to respond to spills in the Great Lakes. Again, he did not specifically reference the plan nor is it apparent that he was familiar with the plan.

In summary, Plaintiffs' arguments to include Admiral Zukunft's November 2017 testimony, without more corroborating evidence, are entirely based on inference and conjecture. But maybe there is evidence that might corroborate the inferences Plaintiffs seek to draw from the Admiral's testimony alone. Plaintiffs will be extended a further opportunity to supplement their briefing (as well as Defendants) with any additional factual information that would corroborate their contention that:

- Admiral Zukunft or the Coast Guard did in fact do a "deeper read" after the Admiral's April 2015 testimony that was not considered in conjunction with the preparation of the NMACP approved in June of 2017.

- Admiral Zukunft's November 2017 testimony was the Coast Guard's official rejection of the NMACP approved some four months earlier by the Coast Guard.

## V.

Before reaching a conclusion on the instant motion to supplement the record, however, there are a few additional unanswered legal questions that should also be addressed in addition to the unanswered factual questions. The EPA's August 2018 ACP Handbook contains the following description of ACP updates and modifications:

> Technological advances, jurisdictional and organizational changes, infrastructure changes, and other factors may lead to a perceived need to modify or update the ACP. The AC should consider establishing an appropriate update cycle. In addition, a means for providing interim updates should be established for significant events that cannot be deferred to the update cycle (e.g. identification of new worst-case discharge scenarios from vessel response plans and FRPs that are higher than the worst-case discharge in the current ACP). Acting in this manner

makes ACP version control and date-stamping an essential part of ACP management and enables all users to work with the most current information.[7]

The Oil Pollution Act also addresses ACP updates at 33 U.S.C. § 1321(j)(4)(C)(ix): "The Area Contingency Plan *shall* . . . be updated periodically by the Area Committee." (emphasis added). Thus, pursuant to the statute it appears that updates are mandatory, not advisory, although the statute does not explain what qualifies as a "periodic" update and how much discretion the Area Committee has in determining when that update ought to take place. The NMACP itself also contemplates updates:

> The ACP is a living document. Updates and revisions will be conducted by the Plan Review Sub-Committee on an ongoing basis throughout the year. Suggestions and comments about the plan are welcome any time. A formal review will be conducted annually by the Plan Review Sub-Committee. The Plan Review Sub-Committee is responsible for maintaining the Record of Changes and updating the plan on Homeport and on the RRT website (http://www.rrt5.org). The RRT website is an internet portal maintained as an information clearinghouse for members of the RRT and the general public.

NMACP at 35.

Accordingly, the parties will be directed to answer the following questions in supplemental briefing:

- Has the Coast Guard established an updated cycle?

- If so, when is the next scheduled update?

- Is there legal authority to reopen a certified plan based on later research or factual events?

- Would the November 2017 Senate testimony of Adm. Zukunft potentially be subject to consideration in conjunction with the next update to the NMACP?

**VI.**

---

[7] https://www.epa.gov/sites/production/files/2018-10/documents/acp_handbook_10-18-2018.pdf, at pg 11.

Accordingly, it is **ORDERED** that Plaintiffs' supplemental brief is due on **May 1, 2019**, and Defendants' is due on **May 15, 2019.**

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: April 11, 2019