# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

ENVIRONMENTAL LAW & POLICY
CENTER and NATIONAL WILDLIFE
FEDERATION

             Plaintiffs,

      v.

UNITED STATES COAST GUARD,
REAR ADMIRAL JOANNA M.
NUNAN, in her official capacity as the
Ninth Coast Guard District Commander

             Defendants,

ENBRIDGE ENERGY, LIMITED
PARTNERSHIP,

             Defendant-Intervenor.

Case No. 1:18-cv-12626-TLL-PTM

Judge Thomas L. Ludington

Magistrate Judge Morris

---

# DEFENDANT-INTERVENOR
# ENBRIDGE ENERGY, LIMITED PARTNERSHIP'S RESPONSE
# IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
# JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant-Intervenor, Enbridge Energy, Limited Partnership ("Enbridge"), hereby opposes Plaintiffs' motion for summary judgment and moves, in accordance with Fed. R. Civ. P. 56, based on the Memorandum of Law submitted herewith, for summary judgment on all claims asserted in Plaintiffs' complaint [ECF No. 1].

As required by E.D. Mich. LR 7.1(a), the undersigned counsel for Enbridge certifies that he communicated in writing with counsel for Plaintiffs, explained the nature of the relief to be sought in this cross-motion and sought concurrence in the relief.  Counsel for Plaintiffs expressly denied concurrence.

LOCAL RULE CERTIFICATION: I, David H. Coburn, certify that this document and the accompanying supporting brief comply with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 14 point (for proportional fonts).

WHEREFORE, the Court should deny Plaintiffs' Motion for Summary Judgment and grant summary judgment in favor of the Federal Defendants and Enbridge.

RESPECTFULLY SUBMITTED this 9th day of August, 2019.

/s/   David H. Coburn
David H. Coburn (DC #241901)
Joshua H. Runyan (DC #977664)
**STEPTOE & JOHNSON LLP**
1330 Connecticut Ave., NW
Washington, D.C. 20036
Telephone: (202) 429-8063
Facsimile: (202) 429-3902
dcoburn@steptoe.com
jrunyan@steptoe.com

PHILLIP J. DEROSIER (P55595)
**DICKINSON WRIGHT PLLC**
500 WOODWARD AVENUE, SUITE 4000
DETROIT, MICHIGAN 48226-3425
TELEPHONE: (313) 223-3866
FACSIMILE: (313) 223-3598
PDEROSIER@dickinsonwright.com

*Attorneys for Enbridge Energy, Limited
Partnership*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ENVIRONMENTAL LAW & POLICY
CENTER and NATIONAL WILDLIFE
FEDERATION

           Plaintiffs,

     v.

UNITED STATES COAST GUARD,
REAR ADMIRAL JOANNA M.
NUNAN, in her official capacity as the
Ninth Coast Guard District Commander

           Defendants,

ENBRIDGE ENERGY, LIMITED
PARTNERSHIP,

           Defendant-Intervenor.

Case No. 1:18-cv-12626-TLL-PTM

Judge Thomas L. Ludington

Magistrate Judge Morris

**ENBRIDGE ENERGY, LIMITED PARTNERSHIP'S MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF ITS CROSS-MOTION
FOR SUMMARY JUDGMENT**

## ISSUE PRESENTED

Enbridge hereby adopts and incorporates the Issues Presented in the Federal Defendants' Cross-Motion for Summary Judgment, at 1 [ECF No. 42] (hereinafter "Federal Defendants' Brief").

## <u>MOST CONTROLLING AUTHORITY</u>

Enbridge hereby adopts and incorporates the Controlling or Most Appropriate Authority set forth in Federal Defendants' Brief, at 2. In addition, Enbridge adds the following case to the list of Controlling or Most Appropriate Authority: *Nat'l Wildlife Fed'n v. Sec'y of Dep't. of Transp., et al.*, 374 F. Supp. 3d 634, 650-51 (E.D. Mich. 2019) (J. Goldsmith).

# **TABLE OF CONTENTS**

ISSUE PRESENTED .................................................................................. i

MOST CONTROLLING AUTHORITY .................................................. ii

INTRODUCTION ....................................................................................1

BACKGROUND ......................................................................................6

    A.    The NMACP...................................................................7

    B.    Enbridge's Line 5 Response Plans .................................7

STANDARD OF REVIEW .....................................................................11

ARGUMENT ..........................................................................................11

    I.    The Coast Guard's Approval of the NMACP Complied with the APA and OPA ..........................................................................11

        A.    The Coast Guard's Administrative Record Assesses Strategies and Equipment to Respond to a WCD During Ice Conditions .14

        B.    The Coast Guard's Administrative Record Assesses Strategies and Equipment to Respond to a WCD During High Wave Conditions ................................................................19

        C.    The Cases Cited by Plaintiffs Are Inapplicable to the Coast Guard's Approval of the NMACP ...........................................21

    II.    The NMACP Should Not be Vacated and the Adequacy of Response Plans Are Not Before This Court .......................................................24

CONCLUSION .......................................................................................28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alaska Dep't of Env't Conservation v. EPA*,
540 U.S. 461 (2004)........................................................................................24

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
988 F.2d 146 (D.C. Cir. 1993)........................................................................24

*Anglers of the Au Sable v. U.S. Forest Serv.*,
565 F. Supp. 2d 812 (E.D. Mich. 2008)..........................................................22

*Charter Tp. of Van Buren v. Adamkus*,
10 F. Supp. 2d 766 (E.D. Mich. 1998)............................................................21

*Colorado Entl. Coal. v. Salazar*,
875 F. Supp. 2d 1233 (D. Colo. 2012)............................................................26

*Cox v. Standard Ins. Co.*,
585 F.3d 295 (6th Cir. 2009) ..........................................................................18

*Forest Guardians v. USFS*,
329 F.3d 1089 (9th Cir. 2003) ........................................................................19

*Greenbaum v. EPA*,
370 F.3d 527 (6th Cir. 2004) ..........................................................................12

*Kentucky Waterways All. v. Johnson*,
540 F. 3d 466 (6th Cir. 2008) .........................................................................23

*Marsh v. Or. Nat. Res. Def. Council*,
490 U.S. 360 (1989)........................................................................................13

*Meister v. U.S. Dep't of Agric.*,
623 F. 3d 363 (6th Cir. 2010) ....................................................................22, 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).....................................................................................14, 15

*Nat'l Wildlife Fed'n v. Sec'y of Dep't. of Transp., et al.*,
374 F. Supp. 3d 634 (E.D. Mich. 2019)....................................................4, 10, 26

*Saints Mary and Elizabeth Hosp. v. N.L.R.B.*,
808 F.2d 1211 (6th Cir. 1987) ........................................................................24

**Statutes**

33 U.S.C. § 1321(j)(4)(C)................................................................2, 15, 23

33 U.S.C. § 1321(j)(4)(C)(i).............................................................2, 14

33 U.S.C. § 1321(j)(5)(D)................................................................25

33 U.S.C. § 1321(j)(5)(D)(i)............................................................5, 25

33 U.S.C. § 1321(j)(D)(5)................................................................4

Infrastructure of Pipelines and Enhancing Safety Act of 2016, Pub. L. 114-183.........................10

**Other Authorities**

36 C.F.R. § 219.21(a)(2).................................................................22

40 C.F.R. § 300.1.......................................................................2

49 C.F.R. Part 195......................................................................9

49 C.F.R. § 194.5.......................................................................8

# INTRODUCTION

In the over 65 years of its operation, there has never been a release from Enbridge's Line 5 pipeline ("Line 5") into the Great Lakes.  Plaintiffs have now brought this lawsuit challenging the adequacy of the U.S. Coast Guard's ("Coast Guard") plans to respond to a worst-case discharge ("WCD") from Line 5 into surrounding waters.  In doing so, they are asking this Court to serve as a "super-regulator" and second-guess the Coast Guard's technical expertise in its approval of an Area Contingency Plan ("ACP") that would become operative in the event of a discharge.  This Court should decline Plaintiffs' invitation; the Coast Guard acted well within its discretion to find the ACP adequate following its consideration of relevant factors.

The Coast Guard-approved Northern Michigan Area Contingency Plan ("NMACP") was designed to comply with the requirement in the Oil Pollution Act of 1990 ("OPA") that Area Committees composed of federal, state and local authorities, as well as federally-recognized Native American Tribes, as applicable, prepare an ACP that, "when implemented in conjunction with the National Contingency Plan, be adequate to remove a worst case discharge, and to mitigate or prevent a substantial threat of such a discharge, from a vessel, offshore facility,

or onshore facility operating in or near the area." *See* 33 U.S.C. §

1321(j)(4)(C)(i).[1]

Here, the Coast Guard approved the NMACP only after years of conducting

exercises and assessing spill response strategies to confirm that the NMACP fully

addresses the enumerated criteria set forth in 33 U.S.C. § 1321(j)(4)(C). *See, e.g.*,

USCG_00000003-40 (Final Great Lakes Exercise Report concerning exercise

conducted in 2011 to assess oil spill response equipment for use in broken ice

conditions); USCG_00000041-130 (Great Lakes Demonstration 2 Final Report

concerning the "continuance of an effort" by the Coast Guard to practice and

assess response in ice-infested waters).  This fulsome effort included input from

Area Committee members, such as EPA, NOAA, Michigan state agencies, and

Enbridge, to ensure that adequate resources are available to respond to a WCD

occurring anywhere in the geographic region covered by the NMACP, which

includes Line 5's crossing of the Straits of Mackinac.  USCG_00000841 (listing

Area Committee participants); USCG_00000830 (identifying Line 5 as a WCD).

Plaintiffs nonetheless allege that the NMACP is inadequate to respond to a

WCD from Line 5 and that the Coast Guard wrongfully approved the NMACP in

---

[1] The National Contingency Plan is the overarching federal plan under OPA that "provide[s] the organizational structure and procedures for preparing for and responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants." 40 C.F.R. § 300.1.

violation of the Administrative Procedure Act ("APA") and OPA.  *See* Plaintiffs'

Complaint, at ¶¶ 101–110.  However, Plaintiffs' argument fails because the

administrative record in this case fully supports the lawfulness of the Coast

Guard's approval of the NMACP.

Plaintiffs' summary judgment arguments center primarily around a

contention that, in approving the NMACP, the Coast Guard failed to consider

whether the NMACP identifies adequate resources to respond to a release of

petroleum products into the Great Lakes when ice or high waves are present.

However, the record makes clear that the Coast Guard was fully aware of, and

extensively studied and assessed, the ability of the Federal Government, state and

local agencies, and facility operators (such as Enbridge with respect to Line 5), to

respond to a WCD at the Great Lakes during any adverse weather conditions.  The

NMACP is in fact specifically designed to describe *adequate* measures to respond

to "the largest foreseeable discharge in adverse weather conditions," which is

exactly what the OPA demands.  USCG_00000629.

Further, the NMACP recognizes that a facility operator's emergency

response plans (here, Enbridge's two federal government-approved Line 5

Response Plans) are the first level of response, and the NMACP is implemented

only when the operator's and state/local response resources have been depleted.

*See* USCG_00000658.  In fact, the OPA framework is comprised of an operator's

Response Plans, state planning, an ACP, and the National Contingency Plan and is designed to ensure that adequate resources are first and foremost made available by the facility operator, here, Enbridge.  Accordingly, as the operator of Line 5, Enbridge has prepared, in accordance with 33 U.S.C. § 1321(j)(D)(5), its own detailed Line 5 Response Plans to respond to any release from Line 5, including during ice and wave conditions.

The Pipeline and Hazardous Materials Safety Administration ("PHMSA"), the arm of the U.S. Department of Transportation with exclusive statutory responsibility over pipeline safety, approved the Line 5 Response Plans in accordance with its obligation under OPA criteria.  PHMSA concluded that Enbridge has resources ready to deploy to respond to and mitigate a WCD from Line 5 under all weather conditions.  While in a prior case addressing Enbridge's Line 5 Response Plans this Court found deficiencies with respect to PHMSA's procedures in approving those Plans, this Court concluded, over National Wildlife Federation's objections, that Enbridge's Plans identify, as required by the OPA and PHMSA regulations, the strategies, personnel and the equipment to respond to a WCD in adverse weather.  *See Nat'l Wildlife Fed'n v. Sec'y of Dep't. of Transp., et al.*, 374 F. Supp. 3d 634, 650-51 (E.D. Mich. 2019) (J. Goldsmith) ("*NWF v. PHMSA*").  In overlooking that the NMACP is not designed to be the sole emergency response plan, Plaintiffs here compound their failure to acknowledge

that various response capabilities (beyond the NMACP) are available to ensure an adequate response to a WCD in the Great Lakes, as required by OPA.

This Court should also reject Plaintiffs' argument that the Coast Guard's approval of the NMACP should be vacated, along with any Response Plan that is required by OPA to be consistent with the NMACP.  First, as Federal Defendants make clear (*see* Federal Defendants' Brief, at 20-21), the issue of vacatur should *only* be considered, based on further briefing by the parties, *if* this Court were to conclude that the Coast Guard acted unlawfully in approving the NMACP. Second, the adequacy of PHMSA's approval of any Response Plans that are required under OPA to be consistent with the NMACP (such as the PHMSA-approved Line 5 Response Plans) have not been challenged in Plaintiffs' complaint.  *See* Complaint, at Counts I-II (challenging only the NMACP and not naming PHMSA, which is the sole agency with authority to review and approve onshore pipeline response plans, as a defendant).  Thus, whether such Response Plans, as opposed to the NMACP, are contrary to OPA is not an issue that is properly before this Court.  Nor does any aspect of OPA support the proposition that a Response Plan must be deemed inadequate if an ACP were found to be deficient in some respect.  *See* 33 U.S.C. § 1321(j)(5)(D)(i).

For these reasons, as set forth more fully below, the Court should deny

Plaintiffs' Motion for Summary Judgment and grant summary judgment in favor of

the Federal Defendants and Enbridge.

## **BACKGROUND**

Enbridge is a leading company in energy transportation and distribution in

North America.  It owns the U.S. portion of the world's longest liquid petroleum

pipeline system, referred to as the "Lakehead System."  The NMACP challenged

by Plaintiffs in this case identifies Enbridge's Line 5 as "a potential source of a

WCD" within the Great Lakes region.  USCG_00000830.

Line 5, which is part of the Lakehead System, is an approximate 645-mile

crude oil/natural gas liquid pipeline that was constructed in 1953 and which

extends from Superior, Wisconsin, through the Upper Peninsula of Michigan to the

Marysville area in the Lower Peninsula of Michigan and then across the U.S.-

Canada international boundary to Sarnia, Ontario, Canada.  In Michigan, Line 5

crosses the Straits of Mackinac ("Straits") "five miles west of the Mackinac

Bridge," USCG_00000830.  The Straits is an approximately 4-mile long span of

water that connects Lake Michigan and Lake Huron.  For over the last fifty years,

ever since Line 5 was placed into service in 1954, the pipeline has safely and

reliably transported petroleum products across the Straits without any release into

the Great Lakes.

### A.    The NMACP

Enbridge incorporates by reference the Federal Defendants' explanation of the NMACP found at pages 7-8 of the Federal Defendants' Brief.

### B.    Enbridge's Line 5 Response Plans

As this Court recognized, "[f]acilities that could reasonably be expected to cause 'substantial harm' to the environment by discharging oil into or on navigable waters are required to prepare and submit Facility Response Plans."  ECF No. 27, at 7.  "In the event of an oil spill, the Facility Response Plan [ ] is immediately activated."  *Id.*  "Local, area, or regional plans may also be put into motion, depending on the nature of the spill."  *Id.*

The NMACP accordingly recognizes that "[t]he first level of response will generally be the [pipeline operator], followed by local government agencies, and followed by state agencies when local capabilities are exceeded." USCG_00000658.  Only "[w]hen incident response is beyond the capability of the state response, [the U.S. Environmental Protection Agency ("EPA")] or [the Coast Guard] is authorized to take response measures deemed necessary to protect public health or welfare or the environment from discharges of oil or releases of hazardous substances, pollutants, or contaminants."  USCG_00000658-59.  This is due to the fact that "OPA [ ] reaffirmed the basic principle that the primary source of an oil spill preparedness and response system in the U.S. should be implemented

and maintained by the private sector."  USCG_00000687.  Thus, the "USCG's pre-positioned response equipment, other publicly owned response equipment, and other initiatives under the USCG's oil spill response program [are to] be used if the commercial industry **does not have readily available resources**, and **only until such time** that the [federal on-scene coordinator] or the [Unified Command] decides to release the resources".  USCG_00000687 (emphasis added).

Enbridge, as the private operator responsible for a release from its Line 5 pipeline, has prepared and is required by law to implement the two response plans that cover the entirety of Line 5.[2]  The Line 5 Response Plans are implemented only if other precautionary measures applicable to pipeline safety fail and a release occurs.  Other preventative measures include, for example, comprehensive

---

[2] The PHMSA-approved Line 5 Response Plans are comprised of two separate plans, the Superior Region Response Zone Integrated Contingency Plan ("Superior Region Plan") and Great Lakes Region Response Zone Integrated Contingency Plan ("Great Lakes Region Plan").  The Superior Region Plan would be implemented in the event that a discharge occurred on any point on the Line 5 segment that extends from its origination point in Wisconsin to a point near Saxon, in Iron County, Wisconsin.  The Great Lakes Region Plan would be implemented in the event that a discharge occurred on any point on the Line 5 segment that extends from a point near Saxon, in Iron County, Wisconsin to its terminus in Ontario.  Enbridge has divided its Response Plans in this manner in accordance with PHMSA regulations to ensure that response planning resources are best positioned based on their geographic proximity to a potential release.  *See* 49 C.F.R. § 194.5 (requiring a plan to be prepared for each "response zone," which may be a geographic area either along a length of a pipeline or including multiple pipelines).

integrity management and leak detection programs that are implemented by

Enbridge in accordance with PHMSA's regulations implementing the Pipeline

Safety Act, 49 U.S.C. §§ 60101, *et seq*., found at 49 C.F.R. Part 195.  Those

regulations are designed to ensure the safety and integrity of pipelines in order to

minimize the potential for a release.[3]  Consistent with PHMSA's Part 194

Regulations, the Part 195 regulations apply to all onshore pipelines, regardless of

whether a pipeline is located partially on land and/or partially under water.

In the unlikely event that a release occurs on Line 5, Enbridge is required by

OPA to implement the Line 5 Response Plans to respond to that release.  The

resources identified in the Line 5 Response Plans that Enbridge is capable of

deploying are those that have been identified by Enbridge as necessary to respond

to a WCD, which represents the greatest volume of oil that could be released from

Line 5, including in adverse weather conditions (e.g., ice and waves).  The Plans

---

[3] PHMSA's Part 195 regulations, for example, dictate: the design and specifications for pipelines; the pressures at which they may be operated; the frequency in which operators must conduct internal and external investigations of their pipelines to identify potential anomalies; the timelines under which potential anomalies must be inspected and repaired; the procedures under which an operator is to control a pipeline, including to respond to alarms or triggers that may be indicative of a release; the placement of valves that may be remotely shut to minimize a potential release, etc.  *See* 49 C.F.R. Part 195.  Given the breadth of its regulatory expertise and oversight over onshore pipelines, PHMSA's authority to approve emergency response plans for onshore pipelines, including those portions of pipelines that cross waterways, is an integral part of its overall pipeline safety mission.

are designed to: (i) ensure that a release of oil is quickly contained; (ii) direct initial clean-up efforts to mitigate adverse consequences to natural resources; and (iii) establish procedures for coordinating with state and federal agencies regarding a long-term response effort.

This Court recognized that the Line 5 Response Plans specifically identify adequate strategies, equipment, and personnel to respond to a WCD from Line 5 in adverse weather conditions. *NWF v. PHMSA*, 374 F. Supp. 3d at 650 fn 12 (the "WCD calculation 'yields a conservative estimate of the worst-case discharge volume regardless of weather conditions'"). Thus, irrespective of the Coast Guard's own robust response planning capabilities, Enbridge will implement its Line 5 Response Plans to ensure an adequate response when ice or high waves may be present in the Great Lakes. The measures undertaken by Enbridge to implement an effective and timely response would be deployed by Enbridge irrespective of (but consistent with) any planning measures set forth in the NMACP.

In fact, Enbridge's response plans, by virtue of a relatively recent statute, are required to address clean-up in ice conditions. Section 18 of the Protecting our Infrastructure of Pipelines and Enhancing Safety Act of 2016, Pub. L. 114-183 ("PIPES Act") mandates that "[e]ach owner or operator of a hazardous liquid pipeline facility required to prepare a response plan pursuant to part 194 of title 49, Code of Federal Regulations, shall—(1) consider the impact of a discharge into or

10

on navigable waters or adjoining shorelines, including those that may be ***covered in whole or in part by ice***; and (2) include procedures and resources for responding to such a discharge in the plan." (emphasis added). By contrast, the PIPES Act did not amend the required contents of ACPs to address ice conditions.

In sum, the PHMSA-approved Line 5 Response Plans contain strategies to inform and direct a timely and effective response to a WCD release from Line 5 during any adverse weather conditions. In its NMACP, the Coast Guard recognized that operator resources (like those identified in the Line 5 Response Plans) are required by OPA to be available to respond to and mitigate any such WCD, including when ice or high waves are present in the Great Lakes.

## STANDARD OF REVIEW

Enbridge hereby incorporates the Standard of Review set forth in the Federal Defendants' Brief, at 8-9.

## ARGUMENT

## I. The Coast Guard's Approval of the NMACP Complied with the APA and OPA

The NMACP was certified by the Coast Guard's Ninth Coast Guard District Commander Rear Admiral June E. Ryan on June 6, 2017, following extensive consultation with other stakeholders and the development of a fulsome administrative record that acknowledges realities that the Coast Guard is obviously fully familiar with from its own experience: the Great Lakes can be ice covered

11

during winter months and experience heavy seas at times.  The Coast Guard's

approval of the NMACP complies with the APA and OPA because the Agency

fully considered and assessed the capabilities of "[f]ederal, state, and local

agencies, private industry, and international interested parties" to adequately

respond to a release of oil in the Great Lakes during such adverse weather

conditions.  USCG_00000043; *see also Greenbaum v. EPA*, 370 F.3d 527, 542

(6th Cir. 2004) (agency action must be upheld so long as the agency has considered

the relevant factors and articulated a rational connection between the facts found

and agency action).

"[T]he agency has trained for years to respond to an oil break in the Straits,"

and has confirmed that "[a]bsolutely we're confident we can respond" to a WCD in

the Great Lakes, including during adverse weather conditions.  USCG_00000873.

The Coast Guard's administrative record in this case evidences that adverse

weather, including ice and waves, were factors that were closely considered and

assessed by the Area Committee in developing and finalizing the NMACP.  As

stated in the NMACP, "[t]he WCD from a vessel or facility is the largest

foreseeable discharge in adverse weather conditions." USCG_00000629.  "Adverse

weather" is defined under the NMACP to "include significant wave height, ice,

temperature, weather-related visibility, and currents within the Captain of the Port

(COTP) zone in which the systems or equipment are intended to function."
USCG_00000633.

The Coast Guard's "Review and Approval Checklist" for the NMACP
confirms the Agency's technical determination that "[p]roposed tactics have been
developed for responding" in adverse weather, "including: a) ice conditions [ ]; b)
Heavy seas."  USCG_00000856.  With respect to these weather conditions, the
Coast Guard specifically concluded that the NMACP "meets all statutory
requirements [under OPA] with no minor errors or omissions."  USCG_00000856.
*See Marsh v. Or. Nat. Res. Def. Council*, 490 U.S. 360, 377 (1989) ("[b]ecause
analysis of the relevant documents 'requires a high level of technical expertise,' we
must defer to the informed discretion of the responsible federal agencies.").

The Federal Defendants have detailed in their Memorandum in Support of
their Cross-Motion for Summary Judgment the Coast Guard's thorough
consideration of how ice and high-wave conditions could impact a spill response.
*See* Federal Defendants' Brief, at 10-20.  Enbridge agrees with the Federal
Defendants that OPA only requires that the NMACP be "adequate," i.e., sufficient
to respond to a WCD and it need not meet any higher standard that Plaintiffs assert
is applicable.  *See id*. at 16 (citing American Heritage Dictionary of the English
Language (3d ed. 1996) at 21; *see* Oxford English Dictionary (2d ed. 1989) at 150
(equal or amounting to what is required, fully sufficient, suitable or fitting,

competent to deal with the situation)); *see also* 33 U.S.C. § 1321(j)(4)(C)(i) (an ACP is to "be *adequate* to remove a worst case discharge") (emphasis added).

As explained in the sections that follow, the discrete issues identified by Plaintiffs – i.e., the availability of ice-breaking vessels and high waves – do not demonstrate that the response measures identified in the NMACP are inadequate under OPA, particularly in light of the other strategies in place to ensure an effective response, including those deployed under Enbridge's Line 5 Response Plans. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (a court will uphold a decision of "less than ideal clarity if the agency's path may be reasonably discerned").

### A.     The Coast Guard's Administrative Record Assesses Strategies and Equipment to Respond to a WCD During Ice Conditions

Plaintiffs focus their argument on the potential that the USCG's own ice breaking vessels might not be immediately available to address any discharge in the Straits during ice conditions.  The implication of their argument is that the NMACP would only have been adequate if it had provided for USCG's own ice breakers to be stationed in proximity to the Straits throughout the entirety of the period when ice might form on the Lakes.  However, nothing in the law requires that the NMACP provide for ice breakers to be located in the Straits in anticipation of a release from a pipeline that has not had a release for over 65 years, rendering

them unavailable to service other areas of the Lakes, notably port areas, where they undertake vital ice-clearing services.[4]

Of course, the Coast Guard District which approved the NMACP, and which is itself based in an area prone to ice conditions, did not ignore ice as a factor in responding to a discharge, and the administrative record makes this abundantly clear.  With respect to ice breakers, the Coast Guard recognizes that it "owns the ice breakers that could be needed to get recovery equipment to an oil spill" in winter conditions, and recognizes that such vessels will be available – although perhaps not immediately but "within 24 to 48 hours" – for a response. USCG_00000873.  Any delay associated with the arrival of ice-breaking vessels to an incident "doesn't mean the Coast Guard couldn't adequately respond to a spill." *Id*.

Moreover, Plaintiffs wholly ignore the fact that, following the completion of several oil spill response exercises, other measures (aside from Coast Guard ice breakers) are identified in the NMACP to facilitate a response when those ice-breaking vessels may not be immediately available[5]  For example, during spill

---

[4] Nor does Section 1321(j)(4)(C) of the OPA specifically require the NMACP to address measures to respond to a WCD in ice conditions.

[5] With respect to relevant exercises to address ice conditions, the Coast Guard completed the *Acquisition Directorate Research & Development Center Final Great Lakes Exercise 1 Report*, which "describes a three-day exercise involving oil spill response equipment for use in broken ice" and other weather conditions.

response exercise conducted for purposes of preparing the NMACP, "[t]wo tugboats were able to successfully capture and tow a quantity of ice broken from the ice pack." USCG_00000137. Companies that can provide tugs for purposes of an emergency response are thus appropriately identified in the NMACP. *See* USCG_00000817. The Coast Guard also indicates in its record that "Mackinac Island ferries have been asked to function as 'vessels of opportunity' that would help tow skimmers, boom and perform other tasks involved in spill cleanup." USCG_00000872. The Coast Guard's NMACP also identifies private companies to provide vessel support during emergency response. USCG_00000765-66; *see also* USCG_00000764 (establishing "the Vessel Support Unit" that will implement a vessel routing plan for incident response and coordinate transportation on the water and between shore facilities).

---

USCG_00000005. "This exercise focused on the logistics and equipment involved in conducting simulated oil recovery from ice-infested waters," specifically addressing "broken ice conditions that would not allow personnel and equipment to be placed on the ice to carry out the more traditional responses familiar to the Great Lakes region." USCG_00000016. The Coast Guard completed subsequent exercises and demonstrations to study and assess response during adverse weather. *See, e.g.*, USCG_00000043 ("describ[ing] the continuance of an effort by the Coast Guard in collaboration with other [Area Committee members], to gain practical knowledge and field experience in the coordination and operation of equipment, and exploration of techniques applicable to the recovery of oil spills in ice-infested waters."); USCG_00000131-229, ("The exercise produced many valuable 'lessons learned' that are applicable to ice-infested waters within the continental United States").

Other methods to move ice, beyond vessels, are also addressed in the administrative record materials.  For example, the Coast Guard's record demonstrates that it assessed moving ice with a water jet and "bow-mounting" a water cannon on a vessel to move ice.  *See, e.g.*, USCG_00000137.  The Coast Guard also recognized the spill response benefit that could be provided by ice – i.e., it "could help corral the oil, or keep it from drifting on currents and spreading to shorelines."  USCG_00000873.

The Coast Guard also extensively studied the use and capabilities of response equipment to assess its effectiveness during ice conditions.  *See, e.g.*, USCG_00000137("[t]he skimmer was demonstrated in open pockets of water surrounded by rubble and sheet ice"); USCG_00000021 ("The PyroBoom would be a useful tool in combating an oil-in-ice incident as long as sufficient room was reserved for the boom to be deployed and maneuvered."); USCG_00000028 ("…Boom Vane has a great deal of potential in oil cleanup in ice conditions.  The boom could be deployed using the vane to divert oil to a clean-up area; then when broken threatens the boom, it could be moved out of the path of the ice.").

As a result of such assessments, improvements to traditional spill response equipment were identified to ensure that a more effective response is carried out when ice conditions may be present.  *See, e.g.*, USCG_00000137 ("fittings, hoses, and moving parts could be better ruggedized or armored for protection from impact

by rubble ice"; "[a] sling or festoon configuration might help suspend and support the hoses from contact and damage from floating ice"); USCG_00000043 (this effort specifically "explored and demonstrated a variety of commercial oil skimmers, boom capturing, and fire cannon herding equipment in rubble and sheet ice conditions during January 2012 in the Straits of Mackinac on the Great Lakes in northern Michigan."); USCG_00000555 (discussing in-situ burning in ice conditions).

Other technologies to respond during ice conditions (i.e., non-traditional response equipment, such as booms and skimmers) were also assessed by the Coast Guard, including remotely operated vehicles ("ROVs") and autonomous underwater vehicles ("AUVs"). *See, e.g.*, USCG_00000138 ("The AUV performed an abbreviated demonstration of its ability to independently operate under open water and beneath an ice sheet on the second day."); USCG_00000138 ("The ROV demonstrated great potential as an under-ice sensor platform and mission flexibility through its ad-hoc reconfiguration for search and recovery of the disabled AUV.").

Thus, "taking the record as a whole and applying the highly deferential arbitrary and capricious standard," the Coast Guard's determination that the NMACP provides adequate measures to respond during ice conditions was based on a "principled and deliberative reasoning process." *Cox v. Standard Ins. Co.*,

585 F.3d 295, 304 (6th Cir. 2009) (citing *Glenn v. MetLife*, 461 F.3d at 666).

Further, the fact that Enbridge's own response plans identify resources and

equipment to respond to any WCD during ice conditions, offers an additional basis

on which this Court should find that the NMACP was correctly approved.

### B.     The Coast Guard's Administrative Record Assesses Strategies and Equipment to Respond to a WCD During High Wave Conditions

In its assessment on the adequacy of the NMACP, the Coast Guard

specifically concluded that the Plan identifies appropriate "tactics . . . for

responding in . . . Heavy seas." USCG_00000856. At the same time, based on its

expertise and analysis, the Coast Guard recognizes that "[m]echanical containment

and recovery at lakes or seas depend on the wave and wind conditions at the spill

site." USCG_00000115. For example, "[w]ave heights exceeding 2 meters and

wind speed greater than 35 kilometers per hour (km/h) should restrict responders

from deploying skimmers as a response strategy." USCG_00000115. The

NMACP also recognizes that "[v]essels selected should be powerful enough to

control the boom under difficult wind, wave . . . conditions and also provide

protection to crewmembers." USCG_00000029.

The fact that the Coast Guard acknowledges the difficulties it may face

when implementing a response during high-wave conditions does not render the

NMACP inadequate. *See Forest Guardians v. USFS*, 329 F.3d 1089, 1099 (9th

Cir. 2003) ("An agency's actions need not be perfect; we may only set aside decisions that have no basis in fact, and not those with which we disagree."). While wave conditions may make an open water response more challenging or temporarily delayed, shoreline tactics and strategies can still be implemented to effectively respond to a WCD. For example, regardless of wave conditions and limitations on the safe deployment of vessels, sorbent/hard boom, skimmers, and vacuum trucks can be staged immediately following a release to "[p]revent spilled material from impacting the shoreline." USCG_00000594.

The Coast Guard's record also reflects that weather conditions will be closely monitored and taken into account to ensure that a response is as effective as possible when high waves are present. *See, e.g.*, USCG_00000743 (recognizing that "[w]eather, tides and currents are critical information for oil spill response"); USCG_00000290 (including hypothetical winds animation for purposes of studying oil spill dispersion); USCG_00000743 (weather, tide, and water current information are factors that "control operational activities and are used to conduct oil trajectory analyses, assist with resources at risk prioritization and update spill information on maps").

The Coast Guard's administrative record also reflects the fact that Enbridge's Line 5 Response Plans are those that will be initially implemented under OPA to a WCD from Line 5, including in adverse weather: "the agency

would coordinate a response but would only augment boats and equipment brought in by Enbridge and its contractors." USCG_00000873.  In satisfaction of this obligation, the Line 5 Response Plans specify strategies, equipment, and personnel to respond to any WCD in the Straits in less than one hour, even if high waves are present.  Enbridge also "has one 30-foot boat stationed locally" to respond to a release, and "a subcontractor has some smaller local boats." USCG_00000872.  In addition, the record reflects that Enbridge has expended "$7 million on new equipment for the [S]traits" to ensure an effective response to a WCD. USCG_00000872.

Thus, while Plaintiffs argue that the Coast Guard's administrative record is missing key information concerning the capabilities to respond to a release during adverse weather conditions, "to the contrary, . . . the record as a whole confirms . . . that the [Coast Guard] addressed adequately concerns regarding" how a response during adverse weather conditions will be facilitated, including via the use of shoreline strategies, larger vessels, and other measures to mitigate and remove a release of oil from the Great Lakes.  *Charter Tp. of Van Buren v. Adamkus*, 10 F. Supp. 2d 766, 768 (E.D. Mich. 1998).

### C.    The Cases Cited by Plaintiffs Are Inapplicable to the Coast Guard's Approval of the NMACP

The reasonableness of the Coast Guard's action to approve the NMACP is evidenced by the administrative record, and the cases cited by Plaintiffs do not

demonstrate otherwise.  For example, *Anglers of the Au Sable*, cited by Plaintiffs, is not instructive with respect to the Coast Guard's approval of the NMACP.  *See Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812 (E.D. Mich. 2008).  There, the federal agencies were found to have violated the National Environmental Policy Act ("NEPA") by failing to prepare an environmental impact statement to assess impacts to natural resources resulting from proposed gas and oil drilling activities.  However, as recognized by the Sixth Circuit, NEPA "has a specialized standard of review for arbitrariness," which requires the court to assess whether the "agency has, in fact, adequately studied the issue and taken a hard look at the environmental consequences of its decision." *Meister v. U.S. Dep't of Agric.*, 623 F. 3d 363 (6th Cir. 2010) (citing *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339 (6th Cir. 2006)).  Plaintiffs are not claiming that NEPA was applicable to the Coast Guard's action in approving the NMACP and the NEPA "hard look" standard does not apply to the Coast Guard's approval of the NMACP under OPA.

Plaintiffs' reliance on *Meister* fares no better.  There, the U.S. Forest Service ("Forest Service") had promulgated regulations specifying the process and information that must be considered in approving a forest management plan.  The court found that the Forest Service failed to comply its own regulation, 36 C.F.R. §

219.21(a)(2), that required the agency to conduct a demand-supply analysis to accurately assess the number of forest users under the forest management plan.

Here, by contrast, the Coast Guard has not promulgated a regulation that requires it to specifically identify and assess the availability and response times of ice-breaking vessels, or of the capabilities of vessels to respond in wave conditions. The other deficiencies identified by the *Meister* court were with respect to the Forest Service's failure to comply with its other regulations, or its failure to comply with NEPA, which (as explained above) establishes its own review standard that is inapplicable to the Coast Guard's approval of the NMACP.

The Sixth Circuit's decision in *Kentucky Waterways All. v. Johnson*, 540 F. 3d 466 (6th Cir. 2008) is also inapplicable to the facts at hand. There, the court determined that EPA's decision documents did not provide adequate information to allow the court to assess whether exemptions allowed by Kentucky, when viewed cumulatively by EPA, would in fact have a *de minimis* impact on water quality. *Id.* at 492. Here, in stark contrast, the NMACP addresses resources to respond to a WCD in adverse weather conditions and the administrative record reveals that the approval of the NMACP was supported. The OPA requires only that the Coast Guard shall approve an ACP that meets the criteria set forth in Section 1321(j)(4)(C), and that is exactly what the Coast Guard did here.

Plaintiffs have thus raised no grounds on which to second-guess the reasonableness of Coast Guard's decision to approve the NMACP, particularly in light of the totality of its administrative record that reflects the agency's consideration of "relevant factors." *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004) ("[e]ven when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may be reasonably discerned.").  "Upon a careful consideration of the record as a whole [this Court may therefore] conclude that substantial evidence supports the" Coast Guard's decision to approve the NMACP, given the extensive technical and other materials concerning a response to a WCD during icy or heavy wave conditions.  *Saints Mary and Elizabeth Hosp. v. N.L.R.B.*, 808 F.2d 1211, 1212 (6th Cir. 1987).

## II.    The NMACP Should Not be Vacated and the Adequacy of Response Plans Are Not Before This Court

For the reasons set forth in the Federal Defendants' Brief (at 20-21), this Court should not now decide whether to vacate the Coast Guard's approval of the NMACP.  Rather, only if this Court were to determine that the Coast Guard acted unlawfully in approving the NMACP, should further briefing be ordered by this Court concerning an appropriate remedy.  *See Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (specifying two-factor test for vacatur if agency errors have been identified by the court).

Further, even if the adequacy of the NMACP were questioned by this Court, the Court should reject Plaintiffs' contention that any Response Plans required to be consistent with the NMACP should consequently be deemed inadequate by this Court.  While Plaintiffs make this assertion, they cite to no statute or precedent to support the proposition that a Response Plan (like the Line 5 Response Plans) approved by a different agency (i.e., PHMSA) should be found inadequate if the Coast Guard's approval of an NMACP is found to be inadequate.  The plain language of OPA does not support Plaintiffs' argument – OPA requires only that a Response Plan be "consistent with" an ACP.  33 U.S.C. § 1321(j)(5)(D)(i).  This requirement ensures that Response Plans will not conflict with ACPs; it does not condition their adequacy on the adequacy of an applicable ACP.  In fact, nothing under OPA prevents PHMSA from approving a Response Plan even where an applicable ACP is found to be inadequate.  *See* 33 U.S.C. § 1321(j)(5)(D) (setting forth a checklist of six requirements for approval of a Response Plans that do *not* include among them approval or not of an ACP).

In addition, the adequacy of Response Plans for facilities within the geographic region covered by the NMACP is not before this Court.  Plaintiffs' complaint asserts claims only against the Coast Guard and its District Commander concerning a decision to approve the NMACP.  *See* Complaint, at ¶¶ 22-23.  Plaintiffs have not asserted in this lawsuit any claims against any specific

Response Plans, including the Line 5 Response Plans.  Nor have they asserted

claims against the only federal agency with authority to review and approve such

response plans for liquids pipelines like Line 5, PHMSA.  As this Court has

recognized, "PHMSA is in the best position to evaluate the sufficiency of the [Line

5] Response Plans and the Court must rely on its review in this regard, absent

specific challenges by NWF, *which have not been mounted*."  *NWF v. PHMSA*,

374 F. Supp. 3d at 650 (emphasis added) (citing *Arkansas v. Oklahoma*, 503 U.S.

91, 113 (1992); *accord Cherokee Forest Voices v. U.S. Forest Service*, 182 F.

App'x 488, 493 (6th Cir. 2006)).  Moreover, in the above-cited case, NWF tried

and failed to obtain a ruling from this Court that the Line 5 Response Plans did not

provide adequate information on clean-up strategies, equipment, etc.  Plaintiffs'

request for relief here amounts to an attempted "end-run" around that ruling, which

should not be countenanced.

   *Colorado Entl. Coal. v. Salazar*, 875 F. Supp. 2d 1233 (D. Colo. 2012) is

instructive.  There, an environmental organization brought an action against the

Bureau of Land Management ("BLM"), among others, challenging its compliance

with NEPA and the Federal Land Policy and Management Act with respect to the

leasing of federal land for oil and gas development.  The court in that case found

that BLM failed under NEPA to adequately assess environmental impacts resulting

from such oil and gas development activities, vacating BLM's Regional

Management Plan and remanding for further environmental review.  The plaintiff requested that the court also set aside the leases that BLM issued to private parties under the Regional Management Plan.  The Court, however, refused to do so, concluding that BLM's decision to issue the specific leases, and the parties to those leases, were not challenged by the plaintiff, and hence the lease decisions were not "properly before the Court."

Likewise, Enbridge's Line 5 Response Plans and the approvals of those plans by PHMSA are not before this Court and cannot in this case, directly or indirectly, be vacated or otherwise found inadequate under the terms of OPA.

## <u>CONCLUSION</u>

For the foregoing reasons, and for the reasons set forth in the Federal Defendants' Brief, this Court should grant Enbridge's cross-motion for summary judgment and deny Plaintiffs' cross-motion for summary judgment.

RESPECTFULLY SUBMITTED this 9th day of August, 2019.

/s/   David H. Coburn
David H. Coburn (DC #241901)
Joshua Runyan (DC #977664)
**STEPTOE & JOHNSON LLP**
1330 Connecticut Ave., NW
Washington, D.C. 20036
Telephone: (202) 429-8063
Facsimile: (202) 429-3902
dcoburn@steptoe.com
jrunyan@steptoe.com

PHILLIP J. DEROSIER (P55595)
**DICKINSON WRIGHT PLLC**
500 WOODWARD AVENUE, SUITE 4000
DETROIT, MICHIGAN 48226-3425
TELEPHONE: (313) 223-3866
FACSIMILE: (313) 223-3598
PDEROSIER@dickinsonwright.com

*Attorneys for Enbridge Energy, Limited Partnership*

## <u>CERTIFICATE OF SERVICE</u>

I, David H. Coburn, hereby certify that on August 9, 2019, I caused a true

and correct copy of a copy of the foregoing document to be served on all parties of

record via the CM/ECF system.

/s/   David H. Coburn
David H. Coburn (DC #241901)
**STEPTOE & JOHNSON LLP**
1330 Connecticut Ave., NW
Washington, D.C. 20036
Telephone: (202) 429-8063
Facsimile: (202) 429-3902
dcoburn@steptoe.com