UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ENVIRONMENTAL LAW &
POLICY CENTER, and NATIONAL
WILDLIFE FEDERATION,

                Plaintiffs,                    Case No. 18-12626

v.                                          Honorable Thomas L. Ludington

UNITED STATES COAST GUARD,
And REAR ADMIRAL JOANNA M.
NUNAN in her official capacity as
Coast Guard District Commander,

                Defendants.

_____/

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT, GRANTING DEFENDANT COAST GUARD'S MOTION FOR
SUMMARY JUDGMENT, AND GRANTING INTERVENOR ENBRIDGE'S MOTION
FOR SUMMARY JUDGMENT**

On August 22, 2018, Plaintiffs, Environmental Law & Policy Center ("ELPC") and

National Wildlife Federation ("NWF"), filed a complaint against Defendants, United States Coast

Guard and Rear Admiral Joanna M. Nunan in her official capacity as Coast Guard District

Commander. Plaintiffs allege that the Coast Guard's Northern Michigan Area Contingency Plan

("NMACP"), certified by the Ninth Coast Guard District Commander, Rear Admiral June E. Ryan,

on June 6, 2017, is inadequate to respond to a worst-case discharge and that Defendants wrongfully

approved the NMACP in violation of the Administrative Procedure Act ("APA") (Count I) and

the Oil Pollution Act of 1990 ("OPA") (Count II). ECF No. 1.

On October 15, 2018, Enbridge, the owner of two oil pipelines known as "Line 5" which

are identified as a potential source of a worst case discharge in the NMACP, moved to intervene

as a defendant. ECF No. 12. As owner and operator of Line 5, Enbridge was entitled to intervention

as of right. *See* Fed. R. Civ. P. 24(a)(2). The motion was unopposed and was granted on November 1, 2018. ECF No. 17. The administrative record was filed on December 17, 2018 and amended on June 4, 2019. ECF Nos. 20, 32. On February 15, 2019, Plaintiff moved to supplement the administrative record. ECF No. 24. On April 11, 2019, the Court directed supplemental briefing on the motion, and ultimately denied the motion to supplement the record on May 24, 2019. ECF Nos. 27, 31. A full factual and procedural summary can be found in those orders.

On June 20, 2019, Plaintiffs filed three motions: 1) motion for certification of an interlocutory appeal of the Court's order denying Plaintiffs' motion to supplement the administrative record, 2) motion to stay, and 3) motion to extend time for Plaintiffs to file a motion for summary judgment. ECF Nos. 33-35. On June 25, 2019, the Court entered an order denying the motion to stay and granting the motion for an extension of the dispositive motion deadline in part. ECF No. 36. On July 19, 2019, the Court denied Plaintiffs' motion for certificate of an order for interlocutory appeal. ECF No. 41. The Court explained that

> although Plaintiffs' initial motion identified no basis to stray from the clear rule against supplementation of the administrative record with documents post-dating the decision, the Court allowed Plaintiffs an opportunity to brief the issue more thoroughly and the Court provided extensive background research and factual discussion to help guide the inquiry. Plaintiffs' supplemental briefing largely disregarded the questions raised by the Court and reasserted the same arguments already presented, all of which were directly foreclosed by the clear precedent on supplementation of the administrative record. The supplemental briefing only confirmed that there is no substantial ground for difference of opinion, that there is no factual or legal uncertainty to be explored, and that Plaintiffs' cause would not be advanced by certification of an interlocutory appeal.
> ECF No. 41 at PageID.2320.

On July 1, 2019, Plaintiffs filed a motion for summary judgment. ECF No. 37. In accordance with the scheduling order, Defendants Coast Guard and Rear Admiral Joanna Nunan filed their cross-motion for summary judgment/response on August 2, 2019, and Intervenor-

Enbridge filed its cross motion for summary judgment/response on August 9, 2019. ECF Nos. 42, 44. Replies were timely filed. ECF Nos. 46, 47, 48.

## I.

The Oil Pollution Act ("OPA") extensively amended the Federal Water Pollution Control Act (33 U.S.C. § 1301 et. seq.) and added new requirements to provide enhanced capabilities for oil spill response and natural resource damage assessment. The OPA also amended the Clean Water Act and addressed the wide range of problems associated with preventing, responding to, and paying for oil pollution incidents in navigable waters of the United States. It created a comprehensive prevention, response, liability, and compensation regime to deal with vessel- and facility-caused oil pollution to U.S. navigable waters. The OPA greatly increased federal oversight of maritime oil transportation, while providing greater environmental safeguards by:

- Setting new requirements for vessel construction and crew licensing and manning,

- Mandating contingency planning,

- Enhancing federal response capability,

- Broadening enforcement authority,

- Increasing penalties,

- Creating new research and development programs,

- Increasing potential liabilities, and

- Significantly broadening financial responsibility requirements.

The Oil Pollution Act of 1990 was signed into law on August 18, 1990, by George H. W. Bush. Among other things, it amended 33 U.S.C. § 1321. The new law required the President to "prepare and publish a National Contingency Plan ["NCP"] for removal of oil and hazardous

substances," which will "provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges." (d)(1) & (2). The NCP must include:

(A)     Assignment of duties and responsibilities among Federal departments and agencies in coordination with State and local agencies and port authorities . . .

(B)     Identification, procurement, maintenance, and storage of equipment and supplies.

(C)     Establishment or designation of Coast Guard strike teams, consisting of—
(i) personnel who shall be trained, prepared, and available to provide necessary services to carry out the National Contingency Plan;
(ii) adequate oil and hazardous substance pollution control equipment and material; and
(iii) a detailed oil and hazardous substance pollution and prevention plan, including measures to protect fisheries and wildlife.

. . .

(J)     Establishment of procedures and standards for removing a worst-case discharge of oil, and for mitigating or preventing a substantial threat of such a discharge.

(K)     Designation of the Federal official who shall be the Federal On-Scene coordinator for each area for which an Area Contingency Plan is required to be prepared under subsection (j).

33 U.S.C. § 1321(d)

## A.

Under the OPA and the NCP, all of the United States and its territory is divided into jurisdictional zones for purposes of removal and response actions. The U.S. Coast Guard is designated the lead agency for planning and response in the coastal zone and certain major inland water bodies and the EPA is designated the lead agency for the inland zone, with certain exceptions for areas managed by the Department of Defense. EPA, *Area Contingency Planning*, https://www.epa.gov/oil-spills-prevention-and-preparedness-regulations/area-contingency-planning (last visited Feb. 20, 2020); E.O. 12777 from October 18, 1991.

As part of this National Planning and Response System, Area Committees (AC) were established for each area designated by the president. Qualified personnel from federal, state, tribal and local agencies comprise the AC. Each AC, under the direction of the FOSC [federal on-scene coordinator] for the area, is responsible for developing their local ACP. Each AC is responsible for working together as a

- 4 -

committee including all applicable federal, state, tribal and local officials to complete or include in their ACP.
ECF No. 32-2 at PageID.1957.

An Area Contingency Plan (ACP) is a reference document prepared for use by all agencies engaged in responding to environmental emergencies within a defined geographic area. An ACP may also contain Sub-Area and Geographic Response Plans, which may have more limited scope than the ACP itself. An ACP is a mechanism to ensure that all responders have access to essential area-specific information and promotes inter-agency coordination to improve the effectiveness of responses.[1]

The ACP shall:

(i)    when implemented in conjunction with the National Contingency Plan, be adequate to remove a worst-case discharge, and to mitigate or prevent a substantial threat of such a discharge, from a vessel, offshore facility, or onshore facility operating in or near the area;

(ii)   describe the area covered by the plan, including the areas of special economic or environmental importance that might be damaged by a discharge;

(iii)  describe in detail the responsibilities of an owner or operator and of Federal, State, and local agencies in removing a discharge, and in mitigating or preventing a substantial threat of a discharge;

(iv)   list the equipment . . . dispersants or other mitigating substances and devices, and personnel available to an owner or operator, Federal, State, and local agencies, and tribal governments, to ensure an effective and immediate removal of a discharge, and to ensure mitigation or prevention of a substantial threat of a discharge;

(v)    compile a list of local scientists, both inside and outside Federal Government serving, with expertise in the environmental effects of spills of the types of oil typically transported in the area, who may be contacted to provide information or, where appropriate, participate in meetings of the scientific support team convened in response to a spill, and describe the procedures to be followed for obtaining an expedited decision regarding the use of dispersants;

(vi)   describe in detail how the plan is integrated into other Area Contingency Plans and vessel, offshore facility, and onshore facility response plans approved under this subsection, and into operating procedures of the National Response Unit;

---

[1] EPA, *Area Contingency Planning*, https://www.epa.gov/oil-spills-prevention-and-preparedness-regulations/area-contingency-planning (last visited Feb. 19, 2020).

(vii) include a framework for advance planning and decision making with respect to the closing and reopening of fishing areas following a discharge, including protocols and standards for the closing and reopening of fishing areas;

(viii) include any other information the President requires; and

(ix) be updated periodically by the Area Committee.

(D) The President shall—

(i) review and approve Area Contingency Plans under this paragraph; and

(ii) periodically review Area Contingency Plans so approved.

33 U.S.C. § 1321 (j)(4)

The worst-case discharge is defined as "the largest foreseeable discharge in adverse weather conditions." ECF No. 32-2 at PageID.1946. Adverse weather is defined as "the weather conditions that will be considered when identifying response systems and equipment in a response plan for the applicable operating environment. Factors to consider include significant wave height, ice, temperature, weather-related visibility, and currents within the Captain of the Port (COTP) zone in which the systems or equipment are intended to function." ECF No. 32-2 at PageID.1950.

The President delegated his power to approve Area Contingency Plans to the U.S. Coast Guard. E.O. 12777 from October 18, 1991.

**B.**

In addition to each Area Committee creating an ACP that must be approved by the Coast Guard, facilities that could reasonably be expected to cause "substantial harm" to the environment by discharging oil into or on navigable waters are required to prepare and submit Facility Response Plans (FRPs). 33 U.S.C. § 1321(j)(5)(D). Facilities that could cause "significant and substantial harm" are required to have their plans approved by an EPA Regional Administrator (RA). *Id.* These include facilities with the potential for large-scale discharges or releases (such as pipelines, large storage and manufacturing facilities, and railroads). *Id.*

- 6 -

In the event of an oil spill, the FRP is immediately activated. Local, area, or regional plans, such as the ACP, may also be put into motion, depending on the nature of the spill. EPA, *Area Contingency Planning*, https://www.epa.gov/oil-spills-prevention-and-preparedness-regulations/area-contingency-planning (last visited Feb. 20, 2020). According to the OPA, certain facilities that store and use oil are required to prepare plans to respond to a worst-case oil discharge. OPA also sets specific requirements for the development of such plans. In response, EPA developed regulations in 1994 that implement the facility response planning requirements of OPA. These regulations provide flexibility so that facility owners and operators are not required to create a new response plan if they have an existing plan. An FRP must be consistent with the Coast Guard's ACP. 33 U.S.C. § 1321(j)(5)(D)(i).[2]

## II.

### A.

The Ninth Coast Guard District "is responsible for all Coast Guard operations throughout the five Great Lakes, the Saint Lawrence Seaway and parts of the surrounding states including 6,700 miles of shoreline and 1,500 miles of the international border with Canada." US Department of Homeland Security, *Ninth District*, https://www.atlanticarea.uscg.mil/Our-Organization/District-9 (last visited Feb. 20, 2020). The Coast Guard Sector Sault Sainte Marie "is responsible for all Coast Guard missions on Lake Superior, northern Lakes Michigan and Huron, and surrounding navigable waterways." U.S. Department of Homeland Security, *Sector Sault Saint Marie*, https://www.atlanticarea.uscg.mil/Our-Organization/District-9/Ninth-District-Units/Sector-Sault-Sainte-Marie (last visited Feb. 20, 2020).

---

[2] EPA, *Area Contingency Planning (ACP) Handbook* (August 2018),
https://www.epa.gov/sites/production/files/2018-10/documents/acp_handbook_10-18-2018.pdf.

The Northern Michigan Area Committee members include representatives from over 10 federal and international agencies, 3 Michigan departments, emergency services from 27 Michigan counties, tribal representatives from 6 tribes, 7 port stakeholders (including Enbridge), 6 BOA contractors, 3 environmental groups, and 2 northern Michigan higher education institutions. ECF No. 32-2 at PageID.1965-1967. The boundaries of the NMACP are shown below.


Figure 1: Sector Sault Sainte Marie Area of Responsibility

ECF No. 32-2 at PageID.1959.

### B.

The NMACP "is an element of the National Oil and Hazardous Substances Pollution Contingency Plan (40 CFR 300) (NCP) and enhances or is supported by [multiple] additional contingency plans and regulations" including the NCP, national response framework, the Sault Area Maritime Security Committee, and Multiple Sector Lake Michigan Geographic Response Plans (GRPs). ECF No. 32-2 at PageID.1962. The NMACP also discusses international agreements between the US and Canada due to the close proximity of the Canadian border to the area involved in the NMACP. *See e.g.*, ECF No. 32-2 at PageID.1985.

One part of the NMACP includes planning scenarios for an oil spill, including a worst-case discharge (WCD). ECF No. 32-2 at PageID.2146. The WCD by vessel likely would be by the St.

Mary's River by a Canadian tank vessel (capacity 3,162,516 gallons) on the Canadian side of Lake Superior. ECF No. 32-2 at PageID.2146-2147. Tank vessels are prohibited on the U.S. side of Lake Superior. *Id.* The WCD from a facility would be from the Nobel Petro facility in Rogers City, MI, which is on the coast of Lake Huron. ECF No. 32-2 at PageID.2147. The WCD is estimated to be 3,360,000 gallons. NMACP also identifies a second potential WCD from Enbridge's Line 5 under the Straits of Mackinac, which is five miles west of the Mackinac Bridge. *Id.* If the emergency flow properly closes after a release in the pipeline, it is estimated 269,976 gallons could be released into the Straits. If the emergency flow restricting device does not operate as intended, then the WCD is estimated to be 804,888 gallons. *Id.*

In 2016, the Coast Guard issued a 2016 Great Lakes ACP update with a target date of February 1, 2017 for new, approved ACPs. ECF No. 32-1 at PageID.1719. Ultimately, Commander Ryan submitted a letter of approval of the approved NMACP on June 6, 2017. ECF No. 32-2 at PageID.1934 et seq.

On June 6, 2017, Ninth Coast Guard District Commander, Rear Admiral June E. Ryan, certified the NMACP. The NMACP is a 217-page document. The NMACP describes the specific geographic boundaries of the area covered by the plan. It covers over 20 counties in northern Michigan, and surrounding waterways, roughly from Marquette County to the Northwest to Leelanau County to the Southwest to Alpena County to the Southeast to Chippewa County to the Northeast. ECF No. 32-2 at PageID.1959. The introduction to the plan provides as follows:

> This Area Contingency Plan (ACP) describes the strategy for a coordinated federal, state, tribal and local response to a discharge or substantial threat of discharge of oil, or a release or substantial threat of release of hazardous substance(s) within the boundaries of Sector Sault Sainte Marie's Coastal Zone. This ACP addresses response to an average most probable discharge (AMPD), a maximum most probable discharge (MMPD), and a worst-case discharge (WCD). Planning for these scenarios covers the expected range of spills possible in the coastal zone covered by this ACP.

For purposes of this plan, the AMPD is the average spill in the area based on the available historical data. The MMPD is also based on historical spill data, and is the discharge most likely to occur taking into account such factors as the size of the largest recorded spill, traffic flow through the area, hazard assessment, risk assessment, seasonal considerations, spill histories and operating records of facilities and vessels in the area. The WCD from a vessel or facility is the largest foreseeable discharge in adverse weather conditions. In addition, approximately 500 miles of oil product transmission pipelines run through this area from northwest Canada and Wisconsin through the Upper Peninsula of Michigan and Northern Lower Michigan to points south. The worst-case discharge from a pipeline would be its entire contents between two automatic shut-off locations as the pipeline transits along, over, under or through a navigable water or adjacent shoreline (49 CFR 194). Finally, over 1200 miles of railroad pass through this area. The worst-case discharge for a rail shipment would be the discharge of the entire contents of a unit train, for planning purposes would be the total discharge of all contents of the entire train.

This plan shall be used as a framework for response mechanisms to evaluate shortfalls and weakness in the response structure before an incident, and as a guide for reviewing vessel and facility response plans required by the Oil Pollution Act of 1990 (OPA 90). The review for consistency should address, at a minimum, the economically, environmentally and culturally sensitive areas within the zone, response equipment (quantity and type) available within the zone (this includes federal, state, tribal and local government and industry owned equipment); response personnel available; equipment and personnel needs compared to those available, protection strategies, etc. This plan is written in conjunction with National Oil and Hazardous Substances Contingency Plan (NCP) 40 CFR Part 300 and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) US EPA CERCLA. ECF No. 32-2 at PageID.1946.

The NMACP contains the following description of a worst-case facility discharge:

Worst Case Discharge (Facility). The largest sources of a worst-case discharge into navigable waters are the US Oil Co. facility and the Nobel Petro facility. US Oil Co. is located on the Cheboygan River, which flows into Lake Huron. The facility is within U.S. EPA Region V's FOSC responsibility. The terminal has several large storage tanks and is situated up gradient from the Black River. WCD is estimated to be 46,143 bbls (1,938,006 gallons). Product type and potential cause of discharge are considered SSI and is located in Appendix K with proper authorization. The NoblePetro facility is located in Rogers City, MI adjacent to Lake Huron. The facility has one main storage tank. WCD is estimated to be 80,000 bbls (3,360,000 gallons). *Enbridge Energy also has a pipeline that crosses the Straits of Mackinac five miles west of the Mackinac Bridge. This pipeline is a potential source of a WCD. Factoring in the element of probability, a full breaching of both 20" lines crossing the Straits has the potential to release 6,428 bbls (269,976 gallons)*

> *provided the Emergency Flow Restricting Device (EFRD) closes properly after indication of a release. It is estimated up to 19,164 bbls (804,888 gallons) could be released if the EFRD fails to close in normal time. This is based on an assumed 13-minute time frame for event recognition and remote operated EFRD closures, assuming full line fill volume in the two lines. Products in Line 5 are primarily light and medium crude oil and natural gas liquids. This scenario was ranked #1 overall during the 2013 NMAC Risk Assessment based on Severity, Probability and Impact.*

*Id.* at 214 (emphasis added).

## C.

The administrative record includes summaries of three exercises conducted by the Coast Guard and local emergency response teams in the Straits of Mackinac. The groups who participated in the first exercise were: USCG Research and Development Center, the USCG Sector Sault Ste. Marie, USCG District 9, USCG Oil Response United, Michigan Department of Environmental Quality ("MDEQ")[3] (observer), Government of Ontario, Canada (observer), Science Applications International Corporation, and OSROs. ECF No. 32-1 at PageID.1333. The first exercise was conducted on April 2011 and the final report was generated in July 2011. ECF No. 32-1 at PageID.1320 et seq. There was no ice present during the first exercise, but some lessons learned included the importance of "operator training on the equipment," the "need to keep personnel warm, dry, fed, and rested," and the exercise provided a unique opportunity for Coast Guard and contract personnel to work together during the exercise. *Id.* at PageID.1346.

The second exercise occurred on January 2012 and the report was completed in June 2012. *Id.* at PageID.1358 et seq. The exercise lasted four days, two days of which occurred on the water. *Id.* The participants in the second exercise were: the USCG Research and Development Center CG District 9, Station St. Ignace, Sector Sault Ste. Marie, CG National Strike Force personnel,

---

[3] In 2019 Michigan Governor Whitmer renamed the Michigan Department of Environmental Quality the Department of Environment, Great Lakes, and Energy. Exec. Order 2019-06, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-490039--,00.html. Because the 2017 ACP was written prior to the department name change, the department will be referred to as "DEQ" throughout the order.

Representatives from CG Districts 1, 5, 13, and 17, Enbridge Pipeline, EPA, National Oceanic and Atmospheric Administration, Science Applications International Corporation. *Id.* at PageID.1375. Observers included the CG Headquarters, CCG, and MDEQ. *Id.* The exercise was also four days – two days on the water and two days on land. *Id.* at PageID.1376. The executive summary of the report notes that "[w]hile oil recovery issues have come to the attention of responders, researchers, and other stakeholders, work continues on improving response capabilities under possibly harsh conditions." *Id.* at PageID.1364. Multiple types of equipment were tested, including a grooved drum skimmer ("better candidate for use in open water or quiet pools"), a DESMI PyroBoom, ("successfully capture[d] and tow[ed] a quantity of ice broken from the ice pack by actions of one of the tugs" with towing speed "kept to a minimum"), a self-contained fire monitor ("[w]hile slow and a bit tedious, this method [of guiding oil spill surrogate into a pocket] appeared to work, but moving larger pieces of rubble ice with the water jet was difficult"), a rope-mop skimmer ("should be deployed in more open water for maximum efficiently" but "appeared to operate successfully"), a DESMI Helix skimmer ("successfully deployed from the Coast Guard Cutter (CGC) Hollyhock, both under rubble and sheet ice conditions"), a DESMI Polar Bear (not fully tested because improperly cleaned from a prior oil spill), and a remotely operated vehicle with UV fluorometer ("showed great potential both as a means of locating oil concentrations under sheet ice and potentially as a means of positioning and manipulating oil recovery equipment beneath the ice"). *Id.* at PageID.1364-1365.

The third exercise occurred in February 2013 and the report was finalized in June 2013. *Id.* at PageID.1448 et seq. Similar to the first two exercises, the exercise was four days – two on water, two on land. *Id.* at PageID.1454. The participants for the third exercise included: CG Research and Development Center, CG District 9, Sector Sault Ste. Marie, CG National Strike Force, CG K17,

CG Training Center (TRACEN), Yorktown, National Oceanic and Atmospheric Administration, and Science Applications International Corporation. *Id.* at PageID.1465. Observers included the Office of Marine Environmental Response, MDEQ, U.S. EPA, Enbridge Pipeline, NOAA Thunder Bay National Marine Sanctuary, BPXA from Alaska, Alpena Community College, and CG Marine Safety Unit from Duluth, MN. *Id.* at PageID.1465-1466. The summary of the report concluded that

> [t]he objectives of this effort were successfully achieved through the demonstration of multiple pieces of equipment, procedures, and tactics for the recovery of oil in ice-infested waters. The equipment was safely deployed, the appropriate equipment and personnel to perform a response were identified, operating procedures have been developed [] and training was done. . . . Overall, the competence of the vessel crews and responders really made this demonstration successful and will serve as an initial benchmark for spill responders in the Great Lakes and as a reference for Arctic responders.
> *Id.* at PageID.1497.

The Coast Guard's After Action Report from a September 24, 2015, exercise sponsored by Enbridge was finalized on January 11, 2016. *Id.* at PageID.1722 et seq. The September 2015 exercise "included the deployment of assets to test the Enbridge Straits of Mackinac Tactical Response Plan and validated a draft USCG Geographic Response Plan for the Straits pipeline. . . . The scenario involved a release of 4,500 bbls of medium crude (189,000 gallons) into the Straits of Mackinac from Enbridge Line 5." ECF No. 32-1 at PageID.1724. The exercise looked at on-shore, near-shore, and open water recovery procedures. *Id.* Most of the lessons learned focused on improving communication to improve recovery operations. The Enbridge Emergency Response Exercise: The Straits of Mackinac Participant Handbook from September 24, 2015, was also included in the record. *Id.* at PageID.1662 et seq. The handbook outlined the rules for the exercise and the expectations of participants from the September 2015 Exercise.

The record includes notes from two different conversations Coast Guard representatives had with Michigan Senator Gary Peters. *Id.* at PageID.1616, 1717-1718. There are also multiple email chains between the Coast Guard and various interested parties. *See e.g.*, ECF No. 32-2 at PageID.1742-1748. A draft version of the NMACP is included. ECF No. 32-2 at PageID.1754 et seq. There is also a geographic response plan ("GRP") included in the record, which is included as an appendix to the NMACP. ECF No. 32-2 at PageID.1908 et seq.

In addition, a Coast Guard PowerPoint is included in the record. It explains the USCG Sector Sault in 2011 conducted an Oil-in-Ice Equipment Deployment Drill, in 2012 conducted Oil-in-Ice Full Scale Exercise in the Straits of Mackinac, including detection and recovery of submerged oil. In 2013 the Coast Guard also conducted a second Oil-in-Ice Full Scale Exercise in the Straits of Mackinac including new techniques and operating procedures, in 2014 conducted an Enbridge Led Full Scale Exercise at Indian River focusing on notification, recovery and rehabilitation of wildlife, and coordinated responses between agencies. ECF No. 32-2 at PageID.2152-2155. In 2015, Enbridge led a Functional with Resources Deployment Exercise at St. Ignace focusing on communication, identifying priorities for spill removal, and establishing a unified command system. The USCG also conducted a Table Top Exercise with Mark West Pipeline and an Area Maritime Security Committee Table Top Exercise with Train Derailment and a Hazmat Spill Scenario at St. Mary's River Rail Bridge which is adjacent to the Sault Locks. *Id.* at PageID.2156.

At the end of the record, there are several quotes from Detroit Free Press articles. One quote is from Jerry Popiel, the incident management advisor for the CG's 9th District, stating "when you get above 3-, 4-, 5-foot seas – definitely at 5 feet – you are beyond where you can safely deploy these things and have them do any good." ECF No. 32-2 at PageID.2188. The record

- 14 -

does not provide information regarding when this information was shared or who the intended audience was. There are also quotes from an unknown newspaper where Coast Guard Planning Officer Steven Keck explained crews do not conduct spill recovery at night, that high waves and strong currents is one of the biggest difficulties for Enbridge, that Enbridge needs to train individuals on its new equipment, and that Mackinac Island ferries are designated "vessels of opportunity" should the need arise with an oil spill. ECF No. 32-2 at PageID.2189. Mr. Keck also told the reporter that Enbridge is the primary party responsible for an oil spill clean-up, not the Coast Guard. *Id.* at PageID.2190. Mr. Keck explained that the ice breakers could be 24–48 hours away during an oil spill and while the "ice creates a challenge," the Coast Guard is "confident we can respond." ECF No. 32-2 at PageID.2190. Lastly, Mr. Keck also stated that high waves could inhibit a response to an oil spill. *Id.*

### D.

The record also included testimony by Admiral Zukunft. Admiral Paul F. **Zukunft** is the former Commandant of the U.S. Coast Guard. ECF No. 32-1 at PageID.1554. The Commandant is the highest-ranking member of the United States Coast Guard. In April of 2015, Adm. **Zukunft** testified before the U.S. Senate Subcommittee on Oceans, Atmosphere, Fisheries, and the Coast Guard. *Id.* The Subcommittee is under the purview of the U.S. Senate Committee on Commerce, Science, & Transportation. *Id.* The relevant testimony was as follows:

> Senator PETERS. And, from the report, it seems as if you are concerned about some of those plans in the Great Lakes. And I know there have been some issues related to the Pipeline and Hazardous Materials Safety Administration, PHMSA, and we are going to have their reauthorization coming up in this committee, as well. And there have been some significant gaps that have been identified in their ability to respond or to put the plans forward.
>
> How comfortable are you with the *plans in the Great Lakes, particularly—not just with the Straits of Mackinac pipeline, but we have others.* So I guess a couple questions: Do you have enough information regarding those pipelines that cross this pristine environment? And do you feel comfortable that the partners that you work with are in a position to respond as quickly as necessary?

- 15 -

Admiral ZUKUNFT. And *until I have actually seen the plans, Senator, I would have to say, no, I am not comfortable*. And the reason I say that is that information is then factored into what we call an area contingency plan, when you look at what a worst-case discharge might be and then what equipment do you have to have pre-staged to enable a response to a spill of that magnitude. And we found out, again, during Deepwater Horizon, that those area contingency plans were inadequate for a spill of that volume.

So I need to do a deeper read on that, and we owe you a response after we review that *material, our area contingency plans, to say how ready are we for a major spill in the Great Lakes*.

Senator PETERS. Well, I appreciate that and look forward to working closely with your office on that. Because, obviously, we can't make a mistake here, because there is no going back once that happens.

ECF No. 32-1 at PageID.1572 (emphasis added).

## E.

Also included in the administrative record is a copy of the Saint Mary's River Geographic Response Plan ("GRP") from 2013 created by the Coast Guard and Sector Sault Sainte Marie. ECF No. 32-1 at PageID.1620 et seq. The GRP is an appendix to the NMACP and "is designed to be a ready-to-use tool for the Coast Guard Federal On-Scene Coordinator and partner agencies to employ in oil spill and hazardous substance response operations on the St. Mary's River." *Id.* at PageID.1623. The GRP is "a vision document, not a decision document" and is "meant to complement, not supersede, guidance provided in the" NMACP or the U.S. or Canadian sensitivity indexes. *Id.* at PageID.1623.

## F.

When the USCG reviewed and scored the NMACP, all major categories except for planning and logistics received a 3 out of 4 – meaning it met standards. Planning and logistics received a 2 out of 4 indicating they needed additional attention. The overall score was a 31 out of 44 or 71%. ECF No. 32-2 at PageID.2160.

- 16 -

## III.

Before the motions for summary judgment are addressed, Plaintiffs' standing must first be analyzed. ELPC is a non-profit based in Chicago. ECF No. 1 at PageID.5. They also have an office and staff located in Michigan. *Id.* National Wildlife Fund ("NWF") describes itself as a "not-for-profit conservation advocacy and education organization [w]ith over 750,000 members nationwide" including 26,000 in Michigan. *Id.* at PageID.6. NWF is based in DC and also has a Michigan location. *Id.* Both Plaintiffs explain that their "members use and enjoy the Great Lakes for aesthetic and recreational reasons, and for scientific research. They enjoy observing the fish and wildlife, visiting the coasts, boating, kayaking, and swimming." ECF No. 1 at PageID.7.

"The irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). First, Plaintiff must have suffered an injury in fact – an "invasion of a legally protected interest" which is "concrete and particularized" and not "conjectural or hypothetical." *Id.* at 561. Second, the injury must be fairly traceable to the conduct complained of.  *Id.* Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.*

"[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 563–64 (citing *Sierra Club v. Morton,* 405 U.S. 727, 734 (1972)). Plaintiffs explained in their complaint that their members use the Great Lakes for personal recreation and for research. Plaintiffs sufficiently asserted standing, arguing an impending injury in fact – harm to the Great Lakes if an oil spill occurs, the potential oil spill is fairly traceable to the Line 5 pipeline, and this lawsuit seeking to overturn the Coast Guard's determination that the ACP sufficiently provides a plan in case an oil spill occurred in Line 5 ensures redressability.

# IV.

Under the APA a court must set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §706(2)(A). To determine whether an agency has acted arbitrarily or capriciously, a court should consider whether the agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007). However, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, (1983). "The arbitrary and capricious standard is the least demanding review of an administrative action. If there is any evidence to support the agency's decision, the agency's determination is not arbitrary and capricious." *Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson*, 286 F.3d 382, 389 (6th Cir. 2002) (internal citations omitted).

Judicial review is generally limited to the administrative record that was before the agency at the time of its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410–20 (1971). Based on the record before it, an agency is required to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation omitted). Therefore, a party challenging an agency action is required to "show that the action had no rational basis or that it involved a clear and prejudicial violation of the applicable statutes or regulations." *McDonald Welding v. Webb*, 829 F.2d 593, 595 (6th Cir. 1987). A court must give an agency's interpretation of its own

regulations "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, (1994) (internal quotations omitted).

"It is true that agencies are more specialized than courts are. But for courts to defer to them, agencies must do more than announce the fact of their comparative advantage; they must actually use it. And that means, among many other things, that the agency must apply—rather than disregard—the relevant statutory and regulatory criteria." *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 367 (6th Cir. 2010).

## A.

Pursuant to a stipulated order, Plaintiffs and Defendants only submitted two filings. ECF No. 23. Plaintiffs first filed a motion for summary judgment and their second filing was a combined response to Defendants Coast Guard and Enbridge's motions and a reply to their own motion. ECF Nos. 37, 46. Defendants Coast Guard and Enbridge's motions for summary judgment also served as a response to Plaintiffs' motion for summary judgment and their second filings were replies to their own motions. ECF Nos. 42, 44, 47, 48. All briefs focus on the two concerns highlighted in Plaintiffs' complaint – the presence of ice and high waves in the NMACP. Accordingly, the motions will be addressed together.

Federal law requires that the ACP "shall, when implemented in conjunction with the National Contingency Plan, be adequate to remove a worst case discharge, and to mitigate or prevent a substantial threat of such a discharge, from a vessel, offshore facility, or onshore facility operating in or near the area." 33 U.S.C. § 1321(j)(4)(C). Plaintiffs argue in their motion for summary judgment that the "United States Coast Guard approved a plan that fails to respond to a worst case discharge as required by the Oil Pollution Act of 1990 when (1) it entirely failed to consider the need for ice-breaking vessels to reach an oil spill in the Straights [sic] of Mackinac;

and (2) it entirely failed to consider the impact of significant wave heights in the NMACP." ECF No. 37 at PageID.2240-2241. Plaintiffs acknowledge that documentation of three exercises overseen by the Coast Guard are a significant part of the administrative record. *Id.* at PageID.2248-2249. In support of their argument, Plaintiffs highlight a section of the Observations and Lessons Learned part of the report which states,

> Only vessels with the ice hardened capabilities of a CG buoy tender of the Keeper Class Coastal Buoy Tender (WLM), or greater, could operate in this type of environment. Few other vessels with similar characteristics currently operate in the Great Lakes. The CG 140' Bay Class icebreaking tugboats (WTGBs) have capabilities to operate in the ice and the 65' Inland Buoy Tenders have limited capability.
> ECF No. 37 at PageID.2250 (quoting ECF No. 32-1 at PageID.1400).

However, in their reply, Plaintiffs shift their argument and instead argue that "[t]here is no dispute in this case that the Coast Guard is aware of the challenges presented by these adverse – yet common – weather conditions in the Straits of Mackinac. What is disputed is whether, in light of that knowledge, the Coast Guard provides sufficient rationale for its conclusions that (1) 'a delay of one or two days does not mean the response will not be adequate to remove the worse case discharge' and that (2) the need to delay response until high waves to abate does not render the plan inadequate." ECF No. 46 at PageID.2399.

In support of their argument that Defendant is not adequately prepared for a response with ice present, Plaintiffs allege that because the NMACP does not "identif[y] the location of [ice-breaking] Coast Guard vessels, nor specif[y] the amount of time it would take for each of the ice-breakers to reach the Straits of Mackinac if the vessels are in their home ports" or identify commercial ice-breaking companies who could assist if needed, the Coast Guard's approval of the NMACP was arbitrary and capricious. ECF No. 37 at PageID.2256. Plaintiffs also explain in the June 2013 report that the Coast Guard noted that "[a]n ice-breaker may be required to 'break out'

- 20 -

tugs from their frozen-in moorings and open channels through ice for tug transit to operational area," and "to 'break out' barges from frozen-in moorings and open channels through ice for barge transit to operational area." ECF No. 37 at PageID.2251; ECF No. 32-1 at PageID.1496.

In support of their argument that Defendants are not adequately prepared to respond in high waves, Plaintiffs argue the Coast Guard's approval of the NMACP is also arbitrary and capricious because the "NMACP fails to consider the impact of significant wave heights in adverse weather conditions" despite "significant record evidence that significant wave height and activity can delay and preclude timely and effective response by the Coast Guard to an oil spill." ECF No. 37 at PageID.2264. Plaintiffs cite to record evidence of difficulties of deploying booms and skimmers with high waves and argue [w]hile the NMACP describes the potential expertise of the [environmental planning] specialists, it fails to actually mention the considerations taken in the presence of significant wave height." ECF No. 37 at PageID.2266.  Plaintiffs also highlighted record evidence that high waves could create difficulties during an oil spill. Plaintiffs cited to quotes from Jerry Popiel, Incident Management Advisor for the Coast Guard's Ninth District, about how boom and skimmers cannot be safely used in over five-foot waves and Coast Guard Planning Officer Steven Keck explained that large waves inhibit larger ships from responding. ECF No. 37 at PageID.2254-2255.

In addition to discussing the reports from the three Coast Guard exercises, Plaintiffs also discussed the former Commandant of the US Coast Guard's 2015 testimony before the U.S. Senate Committee on Commerce, Science, and Transportation's Subcommittee on Oceans, Atmosphere, Fisheries and Coast Guard. Admiral Zukunft stated that the "pristine environment" of the Great Lakes means "the tolerance for any oil spill, quite honestly, is going to be very low, which means the removal threshold needs to be set very high." ECF No. 37 at PageID.2251-2252 (quoting ECF

No. 32-1 at PageID.1571). Admiral Zukunft also stated that he needed to review the ACP for the Great Lakes before further discussing with Senator Peters about a worst-case discharge in the Great Lakes. Plaintiffs also argued that Senator Peters continued to be concerned about a lack of preparedness in case of an oil spill in the Great Lakes and how the exercises are slightly artificial because all relevant boats are in the area for the exercise, which may not be the case during an actual oil spill. ECF No. 37 at PageID.2253.

Plaintiffs argue the Coast Guard is not entitled to deference because "[a]t issue here is not the Coast Guard's interpretation of the word 'adequate,' but rather its failure to explain how it could have concluded that the NMACP is adequate to respond to an oil spill given repeated and unresolved concerns regarding ice cover and wave height." ECF No. 46 at PageID.2399. Plaintiffs summarize their argument at the end of their reply,

> The record evidence demonstrates that the Coast Guard failed to consider the impact of solid ice cover and high waves when approving the NMACP. The location of ice breaking vessels or plan to deploy these vessels is not referenced in the NMACP. The plan does not identify the proper equipment and resources available to be deployed in ice cover while responders wait for days for a Coast Guard cutter to arrive. Although there is modeling in the record, the Coast [G]uard does not explicitly discuss this, and there is no indication that the Coast Guard sought any information on how far a spill would spread in two or more days, and how that would impact a response to a worst case discharge. The Coast Guard fails to provide a rational connection between the facts in the record and its approval of the NMACP.
> ECF No. 46 at PageID.2410.

### B.

Defendant Coast Guard counters with its own motion for summary judgment. ECF No. 42. The Coast Guard explains that it "considered both of these factors [ice and high waves and] ELPC's argument fails to recognize that the Coast Guard's obligation is to ensure that the Plan is adequate – sufficient for the specific requirements – and does not necessarily have to match ELPC's ideal response." ECF No. 42 at PageID.2332.

The Coast Guard explains that the definition of "adverse weather" in the NMACP includes ice as a factor and the Coast Guard routinely responds to oil spills in the winter. "Cold climate conditions, including the presence of ice, complicate these spill response efforts." ECF No. 42 at PageID.2339. However, the Coast Guard "undertakes exercises in the Northern Michigan area to assess current spill response capabilities and attempt to identify operational performance gaps." *Id.* at PageID.2339. The Coast Guard explained that the first of three exercises provided an opportunity to "assess five different spill technologies and the logistics of potentially using them in ice-filled waters." *Id.* at PageID.2340. The second exercise evaluated "spill recovery technology amidst rubble and sheet ice in the Straits of Mackinac" resulting in "practical knowledge and field experience [for the Coast Guard and other federal, state, local agencies, and private industry] in the coordination and operation of equipment, and exploration of techniques applicable to the recovery of oil spills in icy waters. *Id.* at PageID.2340.  The third exercise allowed for additional experience in rubble and sheet ice conditions. *Id.* at PageID.2341. The Coast Guard also explained it conducted oil recovery activities in ice conditions in Alaska and Duluth, MN. The Coast Guard "has repeatedly affirmed that there are tactics, technologies, and equipment that can work to recover spilled oil in [an ice] environment" and the Coast Guard's Upper Peninsula oil spill contingency preparedness specialist "expressly stated that he is confident that the Coast Guard can adequately respond to an oil spill event in ice conditions in the Straits of Mackinac." *Id.* at PageID.2342.

The Coast Guard argues Plaintiffs misconstrue the term "adequate" from the Clean Water Act and instead are seeking perfection. ECF No. 42 at PageID.2343-2344. Even though ice-breakers may be located in other parts of the Great Lakes during an oil spill, the Coast Guard argues there are (1) on shore and near shore events that could occur while the ice-breaker moves

toward the Straits and (2) "Enbridge has an approved facility response plan that is required to identify and provide personnel and equipment to remove to the maximum extent practicable a worse case discharge" which means Enbridge, not the Coast Guard, has the "onus of conducting the cleanup." ECF No. 42 at PageID.2345.

The Coast Guard has a similar argument for the high wave conditions that concern Plaintiffs. The Coast Guard argues that "[w]aiting for high wave conditions to abate – which is an environmental factor entirely outside the Coast Guard's control – can delay some open-water response actions, but does not render the response insufficient" in part due to the on shore and near shore activities that can be conducted while waves are high. ECF No. 42 at PageID.2347-2348.

The Coast Guard summarizes its argument in its reply stating,

> The Plan must be assessed as a whole; it consists of many different resources that the Coast Guard evaluates collectively. The Plan covers response command structure, response operations organization, planning, and logistics. The Plan identifies personnel and available response equipment, including booms and boats. It incorporates the Geographic Response Plan, which identifies the sensitive ecological areas and specifies the types of appropriate response and the resources needed. The Plan explains how these resources and organizations work together in the event of a discharge.
> ECF No. 47 at PageID.2422-2423.

### C.

Intervenor-Defendant Enbridge also filed a motion for summary judgment. ECF No. 44. Enbridge focuses on the fact that Enbridge's Facility Response Plan, approved by the Pipeline Hazardous Materials Safety Administration, is the first line of defense in a WCD and the ACP only applies after Enbridge's resources have been depleted. ECF No. 44 at PageID.2364-2365. Enbridge also highlights the fact that ice-breaker vessels are not required to stay near the Straits of Mackinac and it points to parts of the record where it explains that tugboats can help in some ice conditions and the Mackinac Island ferries are "vessels of opportunity" should the need arise

during an oil spill. ECF No. 44 at PageID.2376-2677. In addition, there are other ways to move ice, such as with a water jet, and some of the equipment, such as skimmers, booms, remotely operated vehicles, and autonomous underwater vehicles can be used in ice conditions. ECF No. 44 at PageID.2378-2379.

Enbridge also addresses Plaintiffs' high waves argument. Enbridge argues that the "fact that the Coast Guard acknowledges the difficulties it may face when implementing a response during high-wave conditions does not render the NMACP inadequate." ECF No. 44 at PageID.2380. Enbridge also reiterates that its own Facility Response Plan would be first implemented, followed by the ACP. *Id.* Enbridge argues that "Congress [did not] intend[] the Coast Guard to do the impossible." ECF No. 48 at PageID.2434. Enbridge asserts that the OPA does not require "the Coast Guard [to] guarantee an immediate response during any adverse weather, [because that] result [ ] is neither realistic nor required to meet the 'adequate' standard." ECF No. 48 at PageID.2434.

## D.

Plaintiffs cite three cases in support of their motion, *Anglers of the Au Sable v. U.S. Forest Service*s, *Meister v. U.S. Department of Agriculture*, and *Kentucky Waterways Alliance v. Johnson*. In *Anglers of the Au Sable*, the Forest Service was statutorily required to prepare an Environmental Impact Statement if the project would "significantly" affect the environment. *Anglers of the Au Sable v. U.S. Forest Service*, 565 F. Supp. 2d 812, 815–16 (2008). Judge Lawson determined that the Forest Service's approval of proposed oil drilling in the Huron-Manistee National Forest was arbitrary because the Forest Service did not consider whether the plan would have a significant impact upon the unique recreational opportunities available in the forest, some effects of the project were highly uncertain, there was no discussion on the potential precedential effect of the

- 25 -

decision, and there was an inadequate biological assessment of the project on an endangered species. *Anglers*, 565 F. Supp. at 816. Combined, these four concerns "raise[d] substantial questions about the significance of the proposed project." *Id.* at 815–16. Accordingly, the Forest Service's decision did not meet the statutory standard and was arbitrary and capricious. Plaintiffs argue that similar to the Forest Service, the Coast Guard did not consider or did not sufficiently consider the impact of ice and high waves on a WCD from Line 5. However, as the Coast Guard explains, the record includes multiple references to exercises in waters with ice, with the additional efforts that can be implemented from shore, if needed. The Coast Guard's conclusion that ice and high waves would make the recovery process more difficult is not the equivalent of the Coast Guard disregarding the ice and high wave conditions. This case is distinguishable from *Anglers of the Au Sable*.

In *Meister v. U.S. Department of Agriculture*, the Sixth Circuit held that the U.S. Department of Agriculture's "reasons for keeping pre-designation and club trails open to snowmobile use [but not considering cross-country skiers] [was] arbitrary" because it did not comply with a statutory mandate to minimize conflicts between ORVs and other forest visitors. *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 380 (6th Cir. 2010). Plaintiffs discussed the case in their motion but they did not explain how it relates to the current case besides a passing comment that the Coast Guard is "aware of an important aspect of an adequate response to an oil spill in the Straits of Mackinac and Lake Huron, but has entirely failed to consider it in approving the NMACP." ECF No. 37 at PageID.2261. Unlike in *Meister* where the Sixth Circuit found the U.S. Department of Agriculture used a hypothetical number for the number of snow mobile users and chose "zero" for cross-country skiers, both without evidence explaining the rationale, the Coast Guard did consider ice and high waves when approving the NMACP. In fact, the majority of the

exercises occurred in waters with ice and included lessons learned in an effort to improve their response efforts. Simply because the Coast Guard acknowledged additional difficulty with ice and waves does not mean the Coast Guard did not analyze how to clean-up oil in other conditions.

Finally, in *Kentucky Waterways Alliance v. Johnson*, the Sixth Circuit held that it could not review the EPA's decision regarding Kentucky's water regulations because the "EPA's decision document avoids answering" a key question – how much the water quality is impacted by the total amount of discharge, not just how many discharge exemptions are given. 540 F.3d 566, 492 (6th Cir. 2008) (J. Cook concurring). Plaintiffs argued that "[a]lthough [the] Coast Guard may list resources to respond, it leaves out of the NMACP resources that were crucial in its exercises, and the Coast Guard fails to explain why those resources were disregarded. It is unreasonable for the Coast Guard and Enbridge to suggest that this Court can reasonably discern why the Coast Guard concluded the NMACP is adequate to respond to a worst case discharge even though the NMACP lacks a plan for ice breaker delay or high waves." ECF No. 46 at PageID.2406.

However, the NMACP did not "leave out" a plan in case of ice or high waves. The NMACP includes equipment, plans, and options for addressing an oil spill that occurs in any weather, which includes icy waters or high waves. ECF No. 32-2 at PageID.2077-2084. And the record includes numerous exercises where ice breakers were not the only method used to control the simulated oil spill. *See* ECF No. 32-1 at PageID.1320 et seq. The NMACP even explains that "measures to protect life, mitigate further damage to the environment, and stabilize the situation" are the priorities of the emergency response branch. ECF No. 32-2 at PageID.2047. The Coast Guard summarizes their options as follows,

> ELPC's focus on the availability of Coast Guard ice breakers ignores all of the other components of the response identified in the Plan that are not dependent on the presence of ice breakers, and that make the plan adequate. Many response activities will occur on shore and near shore even if an ice breaker is not near the Straits at

the time of the spill. In addition, the Coast Guard report on the 2012 exercise identified six tactics to be used in broken ice conditions and under the ice sheet. Only two of these six tactics identified a need for an ice breaker in order to implement the response action. The Coast Guard report for the 2013 exercise similarly identified six tactics for broken ice or under ice, only one of which requires an ice-capable vessel and two require vessels with appropriate ice classification.

ECF No. 47 at PageID.2423-2424.

Another case cited by all parties is *Motor Vehicle Manufacturers Association v. State Farm*. The Supreme Court found that the National Highway and Transportation Safety Administration ("NHTSA")'s adoption of a mandatory seatbelt requirement instead of the alternative proposed safety feature, airbags, was arbitrary and capricious when "[n]ot one sentence of [NHTSA's] rulemaking statement discusses the airbags-only options. . . . [The] analysis of airbags was nonexistent." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 48 (1983) (internal quotes omitted). Again, this is not the case here. The Coast Guard considered the difficulties of ice in a recovery situation and even dedicated the majority of its exercises to addressing how to best respond to an oil spill in ice conditions – with strategies that both required and did not require the use of an ice-breaker vessel.

## E.

The APA provides an arbitrary and capricious standard for judicial review of agency decisions. 5 U.S.C. § 706(2)(A). Plaintiffs' argument that Defendant Coast Guard failed to consider or did not sufficiently analyze the effect ice and high winds would have on a worst case discharge from Line 5 fails. As highlighted above, the record includes abundant references to ice and high wave conditions. In addition, multiple ice recovery technologies and tools do not require an ice breaker. Simply, because recovery of an oil spill during icy or windy conditions may take longer does not mean the Coast Guard's approval of the NMACP was arbitrary and capricious. It simply means it does not meet the perfection standard Plaintiffs' desire. As the OPA states, oil

spills are simply a part of life and the purpose of the OPA was to reduce the likelihood of future spills and ensure sufficient recovery mechanisms exist for when they undoubtedly occur. *See e.g.*, Oil Pollution Act of 1990, Pub. L. No. 101-380, § 5002.

The Coast Guard has provided sufficient evidence that they considered the possibility of ice and high waves if a worst-case discharge were to occur. The Coast Guard's approval of the NMACP in 2017 was not arbitrary and capricious, did not violate the APA or the OPA, and therefore the Coast Guard's motion for summary judgment will be granted and Plaintiffs' motion for summary judgment will be denied.

Enbridge's central argument that their resources identified in their facility plan are exhausted prior to the use of the ACP is accurate, but irrelevant to the current case. Even though Enbridge's facility plan must be referenced first, it does not lower the Coast Guard's burden to adopt an ACP that will adequately address a WCD. However, Enbridge successfully argued the Coast Guard's approval of the ACP was not arbitrary and capricious because the Coast Guard did consider the difficulties that could be caused by ice and/or high waves during a WCD, and therefore, Enbridge's motion for summary judgment will be granted.

**V.**

Accordingly, it is hereby **ORDERED** that Plaintiffs' Motion for Summary Judgment, ECF No. 37, is **DENIED**.

It is further **ORDERED** that Defendant Coast Guard's Cross Motion for Summary Judgment, ECF No. 42, is **GRANTED**.

It is further **ORDERED** that Intervenor-Defendant Enbridge's Cross Motion for Summary Judgment, ECF No. 44, is **GRANTED**.

It is further **ORDERED** that Plaintiffs' complaint, ECF No. 1, is **DISMISSED**.


Dated: March 16, 2020                              s/Thomas L. Ludington
                                                   THOMAS L. LUDINGTON
                                                   United States District Judge